**FILED**

OCT 0 8 2004

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

**DOCKETED**

OCT 1 2 2004

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THEODORE F. GRADEL,
SARAH GRADEL,
THOMAS A. MAZZA,
JAMES X. MAUDE,

            Plaintiffs,

v.

PIRANHA CAPITAL, L.P.,
LONGBOAT GLOBAL FUNDS MANAGEMENT, LLC,
LONGBOAT GLOBAL ADVISORS, L.L.C., and
ROBERT JOSEPH BEASLEY,

            Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**04C 6539**

Case No. _____

**JUDGE** AMY ST. EVE

**MAGISTRATE JUDGE DENLOW**

## COMPLAINT

Plaintiffs Theodore Gradel, Sarah Gradel, Thomas A. Mazza, and James X. Maude, through their attorneys, as their complaint against defendants Piranha Capital, L.P., Longboat Global Funds Management, LLC, Longboat Global Advisors, L.L.C., and Robert Joseph Beasley, state as follows:

## JURISDICTION
### Founded on Diversity of Citizenship and Amount

1.    Plaintiffs are citizens of the State of Illinois. Defendant Piranha Capital, L.P. is a limited partnership organized under the laws of the State of Delaware with its principal place of business in the State of Florida; defendant Longboat Global Funds Management, LLC is a limited liability company organized under the laws of the State of Florida with its principal place of business in the State of Florida, defendant Longboat Global Advisors, L.L.C. is a limited liability company

organized under the laws of the State of Florida with its principal place of business in the State of Florida; and defendant Robert Joseph Beasley is a citizen of the State of Florida. The matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332.

## STATEMENT OF CLAIM

### COUNT I
### (Breach of Contract)

### The Parties

2.  Plaintiff Theodore Gradel is an individual residing in Naperville, Illinois and a citizen of the State of Illinois. Plaintiff Sarah Gradel is an individual residing in Naperville, Illinois and a citizen of the State of Illinois. (Theodore Gradel and Sarah Gradel are referred to hereinafter collectively as the "Gradels").

3.  Plaintiff Thomas A. Mazza ("Mazza") is an individual residing in Wheaton, Illinois and a citizen of the State of Illinois.

4.  Plaintiff James Maude ("Maude") is an individual residing in Barrington Hills, Illinois and a citizen of the State of Illinois.

5.  Defendant Piranha Capital, L.P. (the "Piranha Fund" or "Fund") is a limited partnership organized under the laws of the State of Delaware with its principal place of business at 2 North Tamiami Trail, Suite 1200, Sarasota, Florida, and doing business in the State of Illinois. Piranha Capital, L.P. is a commodity pool established for the purpose of investing in publicly-traded securities and futures contracts, and other financial instruments.

6.  Defendant Longboat Global Funds Management, LLC ("Longboat Management") is a limited liability company organized under the laws of the State of Florida with its principal place of business at 2 North Tamiami Trail, Suite 1200, Sarasota, Florida, and doing business in the State of

2

Illinois. Longboat Management is the general partner of the Piranha Fund, and registered with the National Futures Association as a Commodity Trading Advisor and as a Commodity Pool Operator pursuant to the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* (2000), and the Regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.* (2003).

7. Defendant Longboat Global Advisors, L.L.C. ("Longboat Advisors") is a limited liability company organized under the laws of the State of Florida and between November 6, 2000 and May 14, 2004, was registered with the National Futures Association as a Commodity Pool Operator pursuant to the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* (2000), and the Regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.* (2003). Longboat Advisors was the Piranha Fund's general partner starting in or about January 2001, until its subsequent replacement by Longboat Management in or about 2002.

8. Defendant Robert Joseph Beasley ("Beasley") is an individual residing at 417 12th Street W, Suite 213, Bradenton, Florida, and a citizen of the State of Florida. At all times relevant, Beasley was the sole managing member, and upon information and belief, the sole owner of Longboat Management and of Longboat Advisors.

9. Non-party Mark Joseph Peterson Boucher ("Boucher") is an individual residing in Menlo Park, California and a citizen of the State of California. At all times relevant, Boucher was an investment advisor for the Piranha Fund, and designated by the general partner as the "Head Trader" for the general partner. Although Boucher held himself out as an investment advisor, he was not registered as a Commodity Trading Advisor with the National Futures Association pursuant to the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* (2000), and the Regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.* (2003), or as an investment advisor pursuant to the Investment Advisor's Act of 1940, , 15 U. S. C. § 80b-1.

3

## The Private Offering

10.    Beginning in February 2001 and continuing through 2002, Beasley solicited each of the Plaintiffs for the purpose of purchasing a limited partnership interest in the Piranha Fund. During his solicitation efforts, Beasley traveled to Chicago in 2001 for the purpose of meeting each of the Plaintiffs.

11.    As part of his solicitation, each of the Plaintiffs was provided with a copy of a Confidential Private Placement Memorandum (the "Offering Memorandum"), which purportedly represented all material disclosures concerning the Piranha Fund, its general partner, and Beasley. A copy of the Offering Memorandum, without exhibits, is attached hereto as **Exhibit 1**.

12.    As part of the Piranha Fund's disclosures, Longboat Advisors represented through the Offering Memorandum that the Fund would "invest in publicly-traded securities and other financial instruments" and that, except for the leverage inherent in the purchase and sale of futures contracts, the "General Partner does not intend to use borrowed funds to purchase assets for the Fund."

13.    The Offering Memorandum also disclosed that Boucher would be the "Head Trader" for the Fund's general partner, and that the "General Partner will be investing in securities based solely on the analysis of Mr. Boucher."

14.    Based on those representations, the Gradels, Mazza, and Maude made an initial investment in the Piranha Fund in May 2002 of $250,000 each, and by doing so became limited partners of the Fund. Mazza and Maude later increased their interest in the Fund by an additional $250,000 each.

## The Fund's Operating Agreement

15.    Attached as an exhibit to the Offering Memorandum was a copy of the Piranha Fund's operating agreement (the "Operating Agreement"), which each of the Plaintiffs executed as a

condition to becoming limited partners of the Fund. A copy of the Operating Agreement provided to each of the Plaintiffs in 2001 is attached hereto as **Exhibit 2**.

16.    As a result of their investment in the Piranha Fund, the Fund established a Capital Account for each of the Plaintiffs, except for the Gradels for which a joint Capital Account was established. Each of the Plaintiffs' investment in the Fund was placed in their respective Capital Account.

17.    In or about 2002, and contemporaneously with Longboat Management replacing Longboat Advisors as the Piranha Fund's general partner, Longboat Advisors assigned its rights and obligations under the Operating Agreement to Longboat Management. None of the Plaintiffs received a notice from the Fund regarding the substitution of the Fund's general partner, nor did the Plaintiffs receive copies of any amendments to the Operating Agreement.

## COUNT I
### Breach of Contract

1.    The allegations set forth in Paragraphs 1 through 17 above are realleged herein as if specifically set forth in this Paragraph 1 of Count I.

2.    At all times relevant, section 4.2 of the Operating Agreement provided, in part, as follows:

Closing Capital Accounts.  A closing Capital Account shall be established on the Fund's books for each Partner as of the end of each Accounting Period.

3.    At all times relevant, Section 6.1 of the Operating Agreements provided, in part, as follows:

Withdrawals from Capital Accounts.

(a) Except as provided in §§ 6.2 and 6.3, a Partner may withdraw, as of the end of any month all . . . of its Capital Account by giving 45 business days prior



written notice (the 'Withdrawal Notice"). . . .

(b) A Withdrawing Partner shall be entitled to receive an amount equal to the lesser of the amount set forth in his Withdrawal Notice or his Closing Capital Account for the Accounting Period in which the withdrawal is effective. Except to the extent provided elsewhere herein, the Fund shall to the extent practicable distribute not less than 95% of the estimated amount withdrawn pursuant to this §6.1 with 10 days after the effective date of the withdrawal.

4.      On July 7, 2004, the Plaintiffs, through Thomas Mazza, personally called the Fund's general partner to inform Longboat Management that the Plaintiffs intended to make a full redemption of their respective interests in the Fund.

5.      Mazza's phone call was followed by a phone call on July 7, 2004, from David Strigham, speaking on behalf of the Plaintiffs, to Pam Patterson ("Patterson"), an employee of Longboat Management, wherein Patterson explained the redemption process that the Plaintiffs would later follow that same day.

6.      Following Mazza and Strigham's calls to Longboat Management, each of the Plaintiffs provided the Fund with a written notice dated July 7, 2004, wherein the Plaintiffs requested a full redemption of their respective Capital Accounts in the Fund.  Copies of the Plaintiff's withdrawal notices are attached hereto as group **Exhibit 3**.

7.      The Plaintiffs have fulfilled all of their respective obligations under the terms of the Operating Agreement.

8.      The Operating Agreement required a limited partner requesting redemption to provide 45-days prior notice of an intent to redeem, and the redemption would be effective as of the end of the month following that 45-day period.  Under the terms of the Operating Agreement, the Plaintiffs redemption of their respective Capital Accounts was effective as of August 31, 2004.  As set forth in 6.1 of the Operating Agreement, the Fund agreed to distribute not less than 95% of the estimated

amount withdrawn.

9.     Provided under the cover of a letter dated September 10, 2004, the Fund provided Plaintiffs a copy of the Fund's Monthly Statement as of August 31, 2004.  Through that Monthly Statement, the Fund reported a net asset value of $30,150,848.54, a net monthly income of $148,656.74, and monthly redemptions totaling $2,769,724.98 as of August 31, 2004.  Attached hereto as **Exhibit 4** is a copy of the cover letter dated September 10, 2004 and the Monthly Statement dated September 10, 2004.

10.     Through a mailing dated September 10, 2004, each of the Plaintiffs was provided a Capital Account Statement dated August 31, 2004, for each of their respective accounts.  The Capital Account Statements dated August 31, 2004, provided to Theodore and Sarah Gradel, Thomas Mazza, and James Maude showed a net asset value of zero, reflecting redemptions of $294,473.70, $566,183.91, and $566,183.91 respectively, for a total redemption to the Plaintiffs of $1,426,841.52.  Copies of the Plaintiffs' individual Capital Account Statements are attached hereto as **Exhibit 5**.

11.     Under the terms of the Operating Agreement, the Piranha Fund was to make its redemption payment to the Plaintiffs within 10 days from the effective date of redemption, which in the instant case would have been September 10, 2004.

12.     By September 10, 2004, the Plaintiffs had not received their respective redemption payments.

13.     Following the Piranha Fund's failure to make the required payment, Mazza made follow-up phone calls to Patterson to inquire why Longboat Management and the Piranha Fund had not sent the Plaintiffs a redemption payout as required under the Operating Agreement.  In each of those calls, Patterson assured Mazza that Longboat Management and the Fund would be paying out the full redemption to each of the Plaintiffs.

14.     As of September 10, 2004, Longboat Management had sufficient reserves of cash or liquid securities and commodities sufficient to make the required redemption payments to the Plaintiffs. Furthermore, as of September 10, 2004, Longboat Management had not exercised any provision in the Operation Agreement freezing the redemption payment.

15.     Through a letter dated September 24, 2004, 24 days after the effective date for Plaintiffs' redemptions and two weeks after the deadline imposed by the Operating Agreement to pay those redemptions, Longboat Management provided notice to the Plaintiffs that it had elected "to suspend the right of withdrawal and postpone the payment of withdrawal proceeds to investors." Longboat Management further stated in its September 24th letter that it would make a general prorated distribution to all investors of "approximately 75% of the Fund's liquid assets." A copy of Longboat Management's letter dated September 24, 2004, is attached hereto as **Exhibit 6**.

16.     On October 6, 2004, the Gradels, Mazza, and Maude received distribution checks from the Piranha Fund for $81,212.51, $156,147.11, and $156,147.11 respectively. The distribution to the Plaintiffs represented approximately 27 ½ % of the amount owed.

17.     Neither Longboat Management nor the Piranha Fund have made any further payments to the Plaintiffs pursuant to Plaintiffs' redemption notices.

18.     By failing to distribute to the Plaintiffs the full amounts reflected in their respective Capital Accounts, the Fund breached the terms of the Operating Agreement with Plaintiffs, with such breach causing and damaging the Gradels, Mazza, and Maude in the amounts of $213,261.19, $410,036.80, and $410,036.80 respectively.

WHEREFORE, Theodore Gradel, Sarah Gradel, Thomas A. Mazza, and James X. Maude pray that judgment be entered in their favor and against Piranha Capital, L.P. and Longboat Global Management, LLC for a total of $1,033,344.79 in compensatory damages, costs, and for such other

relief as the Court may determine.

## COUNT II
### (Common Law Fraud)

1.	The allegations set forth in Paragraphs 1 through 18 of Count I above are realleged herein as if specifically set forth in this Paragraph 1 of Count II.

2.	The Piranha Fund Offering Memorandum indicated that it would primarily invest in equities and futures and made no mention that it intended to make loans in exchange for promissory notes related to real estate investments.

3.	Neither Longboat Advisors, Longboat Management, Beasley, nor Boucher disclosed to the Plaintiffs at the time the Offering Memorandum was provided to the Plaintiffs, or in the offering memorandum itself, that the Piranha Fund intended to make loans in exchange for promissory notes related to real estate investments or that it intended to provide loans to entities in which Beasley had an ownership interest.

4.	Plaintiffs relied on Longboat Management and Beasley's representations referenced above in maintaining their respective investments with the Fund

5.	In or about April 2004, the Plaintiffs received copies of the Piranha Fund's certified annual report titled "Annual Report December 31, 2003 and 2002" (hereinafter referred to as the "2003 Annual Report").   A copy of the 2003 Annual Report is attached hereto as **Exhibit 7**.

6.	The 2003 Annual Report, received by the Plaintiffs in or about April 2004, was the first notice received by the Plaintiffs that the Fund had made "investments" in promissory notes.  In that report, Longboat Management and Beasley represented to the Plaintiffs that the promissory notes listed on its balance sheet were "secured by the security interest in various properties both in the U.S. and overseas and by the assets of the borrower." (emphasis added)  However, the nature of the

property securing the notes was not disclosed, nor was the identity of the borrowers.

7.     Approximately three months later, through a Longboat Management letter dated July 2, 2004 , the Plaintiffs were given notice for the first time:

a)     that the Piranha Fund had invested "a portion of its assets in real estate linked investments," consisting of "relatively illiquid investments";

b)     Longboat Management admitted that promissory notes listed in the Fund's financial statements included promissory notes by entities owned by "related parties," namely Beasley; and

c)     that only some of the promissory notes held by the Fund were secured by real property.

A copy of the Longboat Management's letter dated July 2, 2004 is attached hereto as **Exhibit 8.**

8.     On July 7, 2004, having received a partial disclosure by Longboat Management and Beasley of their self-dealing and fraudulent activity, the Plaintiffs exercised their right under the Operating Agreement and gave Longboat Management and Beasley notice to redeem all of their respective Capital Accounts.

9.     On September 10, 2004, each of the Plaintiffs received a monthly statement from the Fund concerning the status of their individual Capital Account as of August 31, 2004. (*See* Exhibit 5) In each of the monthly statements, the Capital Account showed a zero balance as of August 31, 2004, the full amount having been redeemed and purportedly paid.

10.     Notwithstanding the representations made in the August 2004 monthly statements provided to the Plaintiffs on or about September 10, 2004, neither Longboat Management nor Beasley intended to provide Plaintiffs with a redemption payment.

11.     By September 10, 2004, it also appeared that neither the Fund nor its general fund

was willing to disclose any information about its investments. In the September 10, 2004 cover letter

provided with the Fund's Monthly Statement, the Fund's accountant provided a warning of things to

come:

> Management has elected to omit substantially all of the informative disclosures
> ordinarily included n financial statements. If the omitted disclosures were included
> in the financial statements, they might influence the user's conclusions about the
> partnership's assets, liabilities, net asset value, revenue, and expenses.

(*See* Exhibit 4 (emphasis added))

12. On September 20, 2004, the National Futures Association ("NFA"), a self regulatory

association under the jurisdiction of the Commodity Futures Trading Commission, an independent

federal agency, initiated a Member Responsibility Action against Longboat Management and Beasley

(the "MRA") pursuant to NFA Compliance Rule 3-15, following an investigation of Longboat

Management and Beasley's activities. A copy of the NFA's Notice of its MRA is attached hereto as

**Exhibit 9**.

13. As set forth in the MRA, NFA found the following:

a) that of the approximately $12 million in loans made by the Fund to seven

different entities, nearly $4 million of those loans, or 1/3 of the loans, were made to

entities in which Beasley had an ownership interest;

b) that, except for a partial payment by Beasley made in August 2004 on a loan

to one of his entities, no principal or interest payments had ever been made on any of

the loans since their inception in 2001. Furthermore, the partial payment made by

Beasley was only made after the NFA commenced its review of Longboat

Management and Beasley;

c) when the individual notes matured, instead of the lenders paying the accrued

interest and principal due, Longboat and Beasley would renegotiate the notes by extending the maturity dates and reducing the interest rates;

d)    that "there was no formal due diligence process with respect to the issuers of the notes or the property identified in the notes as security" prior to the issuing of the promissory notes, and that no documentation existed for any informal due diligence process purportedly conducted by Beasley and Boucher. This finding contradicted Beasley's representation in his July 2nd letter that Longboat Management and Boucher had conducted "a due diligence on the properties behind each individual note";

e)    that "Longboat and Beasley have admitted to the NFA that they failed to perfect the security interest relative to [the promissory] notes";

f)    that it was "questionable whether valid security interests were ever created in the first place" to secure the promissory notes; and

g)    that neither Longboat Management nor Beasley have demonstrated "that the obligors on the notes are credit worthy, that they hold good title to the properties which purportedly secure the notes, or that those properties are unencumbered, and marketable, assuming valid security interests even exist."

14.    Upon information and belief, because some, if not all, of the promissory notes were unsecured and those that were purportedly secured were not perfected, the fair market value Longboat Management and Beasley assigned to those promissory notes in the Fund's 2003 Annual Report were inflated, and were not a true and accurate valuation of the promissory notes held by the Fund.

15.    Through the misrepresentations and material omission of facts referenced above,

12

Longboat Management and Beasley have benefited at the expense of the Plaintiffs.

16.     As an example, by the end of 2003, Longboat Management, and thus Beasley, received $1,163,027 in incentive fees, in addition to $500,475 in management fees from the Piranha Fund. (See Exhibit 7)

17.     Longboat Management's incentive fee was based on total income by the Piranha Fund in fiscal year 2003 of $6,455,345. However, $3,826,724 of the Fund's fiscal year 2003 income was derived from interest on the aforementioned promissory notes. The reference in the Piranha Fund's income statement to the interest earned from the promissory notes was a mere bookkeeping entry, because the Piranha Fund did not receive any interest or principal payments on any of the promissory notes that it held since 2001.

18.     Under the Operating Agreement, Longboat Management's incentive fee was calculated, in part, as 20% of the Fund's net income on a quarterly basis.

19.     Under Beasley's scheme to use the Fund's assets to finance his own real estate ventures, Beasley was able to borrow money without having to make any interest payments, thus preserving his own cash, and at the same time received a cash payment of 20% on any accrued interest on his loans and all other loans made by the Fund. Upon information and believe, with the exception of the payments made in Paragraph 13.b above, the Fund never collected any interest on the notes.

20.     Furthermore, Beasley, and upon information and belief, Boucher, were able to finance property that they had a financial interest in through the Fund that could or would not have been financed through a commercial lender.

21.     As reflected above, Longboat Management, Longboat Advisors and Beasley have made material misrepresentations and/or omissions to the Plaintiffs and continue to make material

13

misrepresentations and/or omissions to the Plaintiffs to Plaintiffs' detriment.

22. Plaintiffs' relied on Longboat Management, Longboat Advisors and Beasley's representations, and by inference their omissions, in maintaining their respective Capital Accounts with the Fund, to their detriment.

23. Had the Plaintiffs known and understood that Longboat Advisors, Longboat Management, and Beasley were engaged in a course of conduct in complete contradiction to the Fund's Offering Memorandum and the Fund's financial statements, and that Beasley, and upon information and belief Boucher, were engaged in self-dealing, the Plaintiffs would have immediately redeemed their partnership interest.

24. Through their deceitful conduct, Longboat Advisors, Longboat Management, and Beasley caused the Plaintiffs to be injured.

25. Longboat Management, Longboat Advisors and Beasley's course of conduct, which included material misrepresentations about the financial security of the promissory notes held by the Fund, the self-dealing by Beasley, their failure to disclose that no payments of interest or principal had been made by the issuers over a three year period, the inflation of the Fund's income by accrued interest to enlarge Longboat Management's incentive fee with the resulting decrease in the Piranha Fund's assets, was performed with utter indifference and was carried out with reckless disregard of the Plaintiffs' interest, such that Longboat Management and Beasley should be punished for their conduct and deterred from engaging in such conduct in the future, thereby justifying a judgment with punitive damages.

WHEREFORE, Theodore Gradel, Sarah Gradel, Thomas A. Mazza, and James X. Maude pray that judgment be entered in their favor and against Longboat Global Management, LLC, Longboat Global Advisors, L.L.C., and Robert Joseph Beasley for compensatory damages, punitive

damages to punish and deter those defendants from engaging in such conduct in the future, costs and for such other relief as the Court may determine.

## COUNT III
### (Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act)

1.      The allegations set forth in Paragraphs 1 through 24 of Count II above are realleged herein as if specifically set forth in this Paragraph 1 of Count III.

2.      At all times relevant, there was in effecting the State of Illinois the Consumer Fraud and Deceptive Business Practices Act (the "Act"), 815 ILCS 505/1, which provided, in part, as follows:

> Sec 2. Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, false pretense, false promise, misrepresentation or the concealment . . . . of any material fact, with the intent that others rely upon the concealment, suppression or omission of such material fact . . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

3.      Section 10a of the Act further provides, in part, as follows:

> 10a     Any person who suffers damage as a result of a violation of this Act committed by any other person may bring an action against any such person. The Court in its discretion may award actual damages or any other relief which the court deems proper.
>
> . . .
>
>          (c)      In any action brought by a person under this Section, the Court may grant . . . . reasonable attorney's fees and costs to the prevailing party.

4.      By failing to inform the Plaintiffs of the nature of the activities in the Fund regarding Beasley's self-dealing and the misrepresentations and omissions set forth more fully in Count II of this Complaint, Longboat Advisors, Longboat Management and Beasley engaged in a course of conduct that was calculated to deceive the Plaintiffs and was carried out in reckless disregard of Plaintiffs' interest.

5.     Had the Plaintiffs known and understood that Longboat Advisors, Longboat Management, and Beasley were engaged in a course of conduct in complete contradiction to the Fund's Offering Memorandum and the Fund's financial statements, and that Beasley, and upon information and believe Boucher, were engaged in self-dealing, the Plaintiffs would have immediately redeemed their partnership interest.

6.     Through their deceitful conduct, Longboat Advisors, Longboat Management, and Beasley caused the Plaintiffs to be injured.

7.     Longboat Advisors, Longboat Management and Beasley's course of conduct was performed with utter indifference and carried out with reckless disregard of the Plaintiffs' interests, such that Longboat Advisors, Longboat Management and Beasley should be punished for their conduct and deterred from engaging in such conduct in the future, thereby justifying an award of punitive damages.

WHEREFORE, Theodore Gradel, Sarah Gradel, Thomas A. Mazza, and James X. Maude pray that judgment be entered in their favor and against Longboat Global Management, LLC, Longboat Global Advisors, L.L.C., and Robert Joseph Beasley for compensatory damages, punitive damages to punish and deter those defendants from engaging in such conduct in the future, costs, attorneys fees, and for such other relief as the Court may determine.

## COUNT IV
## (Accounting)

1.     The allegations set forth in Paragraphs 1 through 24 of Count II above are realleged herein as if specifically set forth in this Paragraph 1 of Count IV.

2.     As limited partners of the Fund, the Plaintiffs have a right to a full accounting by the Fund and its general partner.

3.     Because of Longboat Management's refusal to payout the required redemption to the Plaintiffs under the terms of the Operating Agreement, any effort by the Plaintiffs to request an accounting by Longboat Management or the Fund prior to litigation would be futile.

4.     The Plaintiffs demand an accounting by Longboat Management and the Fund concerning the financial and business affairs of the Fund that would show, at a minimum, the following:

     a)     a true and complete accounting of the Fund's financial condition;

     b)     copies of all promissory notes held by the Fund, including all due diligence reports regarding the acceptance of the promissory notes, including but not limited appraisals of any real estate secured or related to the promissory notes, and ownership of any real property related to the promissory notes;

     c)     copies of the Fund's federal, state, and local tax returns for the fiscal years 2001, 2002, and 2003;

     d)     a list of the name and last known business, residence and mailing address of each partner as of December 31, 2003, and as of the date of the accounting; and

     e)     a true and complete accounting regarding the amount of distributions to and/or withdrawals by any general or limited partner, including the date of the distribution and/or withdrawal, the name of the partner, and the amount of the distribution and/or withdrawal.

WHEREFORE, Theodore Gradel, Sarah Gradel, Thomas A. Mazza and James X. Maude pray that an order be entered in their favor and against Longboat Global Management, LLC, ordering Longboat Global Management, LLC to provide Plaintiffs with a full accounting as more fully described above.

## COUNT V
### (Breach of Fiduciary Duty)

1.      The allegations set forth in Paragraphs 1 through 24 of Count II above are realleged herein as if specifically set forth in this Paragraph 1 of Count V.

2.      At all times relevant, by accepting the Plaintiffs' subscription to the Fund, Longboat Advisors, Longboat Management and Beasley owed the Plaintiffs a duty of utmost good faith, integrity and loyalty.

3.      At all times relevant, by accepting Plaintiffs' subscription to the Fund, Longboat Advisors, Longboat Management, and Beasley had, at the minimum, a fiduciary duty to the Plaintiffs', including a duty to the Plaintiffs to exercise due care in performing the services they undertook to provide, a duty not to take unfair advantage of the Plaintiffs, a duty not to engage in self-dealing, and an affirmative duty to disclose all relevant information concerning the activities of the Fund.

4.      By engaging in self-dealing, by accepting incentive fees based on un-recovered income, and by engaging in a scheme to deceive the Plaintiffs, Longboat Advisors, Longboat Management, and Beasley breached their fiduciary duty to the Plaintiffs.

5.      As a result of the breach of their fiduciary duty Longboat Advisors, Longboat Management, and Beasley caused the Plaintiffs to be injured.

6.      Longboat Advisors, Longboat Management, and Beasley's course of conduct was performed with utter indifference and with reckless disregard of the Plaintiffs' interests, such that Longboat Advisors, Longboat Management, and Beasley should be punished for their conduct and deterred from engaging in such conduct in the future, thereby justifying an award of punitive damages.

WHEREFORE, Theodore Gradel, Sarah Gradel, Thomas A. Mazza, and James X. Maude pray that judgment be entered in their favor and against Longboat Global Management, LLC, Longboat Global Advisors, L.L.C., and Robert Joseph Beasley for compensatory damages, punitive damages to punish and deter those defendants from engaging in such conduct in the future, costs, and for such other relief as the Court may determine.

## COUNT VI
### Violation of Section 10 Securities Exchange Act of 1934 and Violation of SEC Rule 10b-5

1. The allegations set forth in Paragraphs 1 through 24 of Count II above are realleged herein as if specifically set forth in this Paragraph 1 of Count VI.

2. At all times relevant, section 10 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j, provided, in part, as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentally of interstate commerce or of the mails, or of any facility of any national securities exchange –

> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

3. At all times relevant, Rule 10b-5 of the Securities and Exchange Commission ("SEC"), 17 C.F.R. 240.10b-5, provided, in part, as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

> (1) to employ any device, scheme, or artifice to defraud,

> (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of

the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any securities.

4.      As set forth more fully in Count II above, Longboat Advisors, Longboat Management, and Beasley engaged in a course of conduct that operated as a deceit upon Plaintiffs and in reckless disregard of Plaintiffs' interest in violation of Section 10 of the Exchange Act and SEC Rule 10b-5.

5.      As a result of their violations of the Exchange Act and SEC Rule 10b-5, Longboat Advisors, Longboat Management, and Beasley breached their statutory duty to the Plaintiffs and caused the Plaintiffs to suffer damages.

WHEREFORE, Theodore Gradel, Sarah Gradel, Thomas A. Mazza, and James X. Maude pray that judgment be entered in their favor and against Longboat Global Management, LLC, Longboat Global Advisors, L.L.C., and Robert Joseph Beasley for compensatory damages, costs, and for such other relief as the Court may determine.

Respectfully submitted,

THEODORE F. GRADEL,
SARAH GRADEL,
THOMAS A. MAZZA,
JAMES X. MAUDE

By_____
One of Their Attorneys

Jeffry M. Henderson
Robert B. Christie
HENDERSON & LYMAN
175 West Jackson, Suite 240
Chicago, Illinois 60604
312-986-6960

Ex. #1

*For the Exclusive Use of:* _____ *Jm Mazzia*       *Copy No.* **817**

*Confidential Private Placement Memorandum*

### PIRANHA CAPITAL, L.P.
*A Delaware Limited Partnership*

*Securities Offered:*
*Limited Partnership Interests*

*Minimum Initial Subscription per Investor:*
*$250,000*

*General Partner and Investment Manager:*
***Longboat Global Advisors, L.L.C.***
*Suite 213*
*417 12th Street West*
*Bradenton, Florida 34205*
*(941) 747-7711*
*Fax (941) 747-7712*

**THE SECURITIES OFFERED HEREBY ARE SPECULATIVE AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. THE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY OF ANY STATE, NOR HAVE ANY OF THE FOREGOING PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DOCUMENT OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**PURSUANT TO AN EXEMPTION FROM THE COMMODITY FUTURES TRADING COMMISSION IN CONNECTION WITH INVESTMENT FUNDS WHOSE PARTICIPANTS ARE LIMITED TO QUALIFIED ELIGIBLE PARTICIPANTS, AN OFFERING MEMORANDUM FOR THIS FUND IS NOT REQUIRED TO BE, AND HAS NOT BEEN, FILED WITH THE COMMISSION. THE COMMODITY FUTURES TRADING COMMISSION DOES NOT PASS UPON THE MERITS OF PARTICIPATING IN A FUND OR UPON THE ADEQUACY OR ACCURACY OF AN OFFERING MEMORANDUM. CONSEQUENTLY, THE COMMODITY FUTURES TRADING COMMISSION HAS NOT REVIEWED OR APPROVED THIS OFFERING OR ANY OFFERING MEMORANDUM FOR THIS FUND.**

*The date of this Private Placement Memorandum is January 12, 2001.*

## General Information

This private placement memorandum (the "Memorandum") is an offer only to the offeree named on the cover page hereof and only if the General Partner authorizes delivery of the Memorandum to the offeree. By accepting this Memorandum, you agree not to give a copy of it to any person other than your advisors.

The limited partnership interests (the "Interests") being offered by this Memorandum are offered privately, only to financially sophisticated high net worth individuals and institutions who satisfy all of the investor suitability and other requirements set forth herein and in the Fund's Subscription Agreement.

The Interests are a speculative investment, they involve substantial risk, and they are suitable only for a limited portion of your portfolio. The Interests are not intended as a complete investment program.

You cannot transfer or resell the Interests except as permitted by the General Partner and in compliance with federal and state securities laws. There is and will be no public market for the Interests.

This Memorandum is not an offer in any jurisdiction where such an offer is not authorized or to any person to whom it is unlawful to make such an offer.

This Memorandum does not represent legal, tax, financial or other advice to you. You should consult your own advisers regarding the legal, tax, and financial or other suitability of this investment. You should not invest unless you are able, without the assistance of an advisor, to evaluate the merits and risks of this investment.

This Memorandum speaks as of the date on the cover page. The delivery of the Memorandum after that date does not imply that the Memorandum is current as of that later date.

No one is authorized to make any representations about the Fund other than those contained herein. You must rely solely on the information set forth herein and your own independent analysis of the investment.

You are invited to ask questions of and receive answers from the General Partner about the terms of the offering and the business of the Fund. All documents referred to herein but not attached, as exhibits are available for inspection by you upon request of the General Partner.

# TABLE OF CONTENTS

<u>Section</u>                                                                                     <u>Page Number</u>

§1.     SUMMARY ........................................................................................................... 1

§2.     INVESTMENT CONSIDERATIONS AND RISK FACTORS ...................................... 5

§3.     THE GENERAL PARTNER AND INVESTMENT MANAGER ................................... 7

§4.     INVESTMENT STRATEGY ................................................................................... 8

§5.     CAPITAL ACCOUNTS .......................................................................................... 8

§6.     FEES AND EXPENSES; INCENTIVE ALLOCATION ............................................. 9

§7.     THE LIMITED PARTNERSHIP AGREEMENT ......................................................11

§8.     TAX CONSIDERATIONS .....................................................................................12

§9.     EMPLOYEE BENEFIT PLAN CONSIDERATIONS ...............................................13

<u>Exhibits</u>

Limited Partnership Agreement ......................................................................... Exhibit A
Subscription Agreement (Investor's Copy) ......................................................... Exhibit B

<u>Accompanying Document</u>

Subscription Agreement

iii

## §1.   SUMMARY

This section of the Memorandum summarizes various features of Piranha Capital, L.P. (the "Fund"). Certain of the items addressed in this Summary are discussed in more detail in the other sections of this Memorandum. This Summary is qualified in its entirety by those other sections, and the entire Memorandum is qualified by the full text of the Fund's governing documents and contractual agreements, all of which are available on request from the Fund.

### General

**The Fund**

The Fund is a newly organized Delaware limited partnership that will invest in publicly-traded securities and other financial instruments. The Fund's general partner and investment manager is Longboat Global Advisors, L.L.C. (the "General Partner"), a Florida limited liability company. Mr. Joseph Beasley, who is President and sole principal of the General Partner, will execute the General Partner's investment strategy for the Fund.

**General Partner**

Longboat Global Advisors, L.L.C.   The sole principal of the General Partner is Mr. Joseph Beasley.

**Investment Manager**

The General Partner is the investment manager for the Fund.   It will conduct all of the Fund's trading.

**The Limited Partnership Interests**

The General Partner is offering limited partnership interests in the Fund (the "Interests").   Investors whose subscriptions are accepted will become limited partners of the Fund. They will have no liability for the Fund's debts or obligations beyond the value of their capital accounts in the Fund.

**Partnership Agreement**

The Fund is governed by its Agreement of Limited Partnership (the "Partnership Agreement"), a form of which is attached as Exhibit A. Prospective investors should read the entire Partnership Agreement before investing. As an investor in the Fund, you will be bound by the Partnership Agreement.

**Investment Strategy And Objective**

The General Partner's investment approach can generally be described as a global, total-return strategy. The Fund is designed for private investors of high net worth, as a means to diversify their portfolios with highly liquid portfolio securities with high return potential. The Investment Manager will use both fundamental and technical analysis in making investment recommendations. The General Partner does not intend to use borrowed funds to purchase assets for the Fund; however, the Fund will be leveraged to the extent that some of its assets, such as futures contracts, have an inherently leveraged nature.

| Securities Broker | Bear, Stearns & Co, Inc. is the Fund's principal broker (the "Broker"). The Fund may from time to time execute its trades through other brokerage firms. |
|---|---|

### The Offering of the Fund's Interests

| General | The Interests are being offered on a private, best efforts basis by the General Partner pursuant to Securities and Exchange Commission Regulation D ("Reg. D") under the Securities Act of 1933, as amended (the "Securities Act"). |
|---|---|
| Offering Period | The Fund has not yet begun investing. The length of the initial offering period will be in the General Partner's discretion. After the Fund starts operations, the Interests will be offered for purchase as of the start of each calendar month and on such other dates as the General Partner permits. The Fund must raise a minimum of $1,000,000 before it will begin operating. |
| Investor Eligibility | You must be an "Qualified Eligible Person" ("QEP") under the Commodity Futures Trading Commission Rule 4.7 in order to invest. In general, in order to be a QEP, an individual must have an investment portfolio of $2 million, and an entity must have an investment portfolio of $5 million. See the Subscription Agreement. |
| Minimum Investment | $250,000. The General Partner has discretion to raise or waive the minimum. |
| Subscription Procedure | You must complete the accompanying Subscription Agreement and return it to the General Partner, along with your subscription funds. If you wish to wire your subscription funds, you should contact the General Partner for instructions. The General Partner may reject any subscription, in its sole discretion. Your subscription funds will be deposited into the Fund's account with its securities broker. Any interest earned on those funds will be added to your capital account in the Fund. |

### The Interests

| Withdrawal of Capital | You may not withdraw any portion of your capital account in the Fund within the first 6 months of investing. After the initial 6 month period you must wait an additional 3 months for a second withdrawal opportunity. After the end of that nine month period, you may withdraw any or all of your capital as of the end of any calendar month. For any capital withdrawal, you must give the General Partner 45 days notice of your desire to withdraw capital. You may not withdraw an amount of capital (less than your entire capital account) that would result in your capital account balance dropping below $250,000. |
|---|---|
| Payment of Withdrawal Proceeds | Withdrawal proceeds will generally be paid within 10 days after the effective date of the withdrawal. The General Partner has discretion to pay withdrawal proceeds in marketable securities rather than cash, and to |

2

withhold up to 5% of the withdrawal proceeds pending completion of the Fund's annual audit for the relevant year if you make a complete withdrawal of your capital.

The General Partner has discretion to (a) suspend investors' withdrawal rights if it determines that, due to extraordinary circumstances, withdrawal would have a material adverse effect on the Fund, and (b) to postpone the payment of withdrawal proceeds (i) in emergency situations, such as the closing of exchanges on which a substantial portion of the Fund's assets are traded, or (ii) if due to technical difficulties or suspension of trading, the Fund cannot accurately value its portfolio.

**Transferability**

The Interests are transferable only with the General Partner's consent, which it has discretion to withhold.

**Voting Rights**

Your voting rights as a Limited Partner of the Fund are limited. Read the Partnership Agreement for details.

<u>Expenses and Incentive Allocation</u>

**Organization and Offering Expenses**

The expenses of organizing the Fund and the initial offering of the Interests (estimated as $15,000) have been paid by the General Partner, which will be reimbursed therefor by the Fund in installments over the first two years of the Fund. The dates and amounts of those installments will be at the General Partner's discretion.

**Overhead Expenses**

The Fund's overhead expenses (mainly office space, furnishings, equipment and clerical personnel) will be borne by the General Partner, without any reimbursement by the Fund.

**Administrative Expenses**

The Fund will pay its direct administrative expenses, mainly fees for legal, accounting, auditing and tax return preparation fees (estimated as $26,000 annually).

**Management Fee and Incentive Allocation**

The Fund will pay the General Partner a monthly management fee at the annual rate of 2.0% of the net asset value ("NAV") of the Fund (0.167% per month). See §6. The Fund's NAV is its total assets minus total liabilities, computed in accordance with generally accepted accounting principles. In addition, the Fund will allocate to the General Partner 20% of any "New High" in the value of your capital account in the Fund as of the end of each calendar quarter. A "New High" is any amount by your which capital account at quarter-end exceeds its "High Water Mark," which is the highest previous quarter-end value of the account (after the account is charged the incentive allocation for that quarter) or, if higher, the starting value of the account. See §6.

**Transaction Expenses**

The Fund will bear the expenses of its investment transactions, principally brokerage commissions (which will be at fully-negotiated

rates) and the interest the Fund will pay on any money it borrows to purchase securities.

### Other

**Distributions**

In view of your capital withdrawal rights, the General Partner does not intend, but does reserve the right, to make distributions to investors of Fund profits or capital.

**Reports**

The General Partner will provide unaudited monthly reports of the Fund's performance and an annual audited financial statement of the Fund certified by an independent public accountant. The General Partner will also give you the necessary information for you to reflect on your tax returns your allocable share of the Fund's income, gain, losses and deductions.

**Termination of Fund**

The General Partner has discretion to terminate the Fund at any time on 30 days notice to the investors.

**Fiscal Year**

The fiscal year of the Fund will be the calendar year.

**Taxation**

The Fund will be treated as a partnership for Federal income tax purposes. The Fund will not be subject to Federal income tax at the entity level. Instead, all income, gain, deduction and loss of the Fund will "flow through" to you.

**Conflicts of Interest**

The management fee and incentive allocation payable by the Fund to the General Partner were established solely by the General Partner and not as the result of arms-length negotiation. The General Partner will have other clients and will not devote its full time to the Fund. The General Partner might have an incentive to favor such other accounts over the Fund's account, although the General Partner will not knowingly do so. The General Partner has an incentive to retain itself as the Fund's investment manager, regardless of its performance. The General Partner, and its affiliates may trade for their own accounts the same securities that the General Partner trades for the Fund. Such trades might compete with, occur ahead of or be opposite to the trades the General Partner effectuates for the Fund, although the General Partner and its affiliates will not knowingly favor their own accounts over the accounts of the Fund. In the interest of privacy, the records of the investment activities of the General Partner and its affiliates will not be available to the investors.

4

## §2. INVESTMENT CONSIDERATIONS AND RISK FACTORS

Prospective investors should consider the following risks, among others, before investing in the Fund.

Potential Loss. As is true of any investment, an investment in the Fund could lose all or a substantial portion of its value. While the Fund seeks in most instances to lessen this risk through diversification and other measures, there is no assurance the Fund will be successful in this regard.

Lack of Operating History. The Fund is a newly formed entity, and has no operating history that investors can use to evaluate the prospects for its future performance. This pool has not commenced trading and does not have any performance history.

Trading Suspension. Various regulatory bodies can intervene in the securities markets, by suspending trading or otherwise. Such regulatory actions could hurt the Fund.

Competition. The Fund competes with other investors for investment opportunities, many of which will have greater access to investment research and other resources than the General Partner.

Brokerage Firm Insolvency. The Fund could incur significant losses in the event of the insolvency of a brokerage firm where it deposits its assets.

Lack of Securities Regulation. The Fund is not registered with the SEC as an investment company, and the offering of the Interests will not be registered under any state or federal securities laws.

Partnership Agreement. The Partnership Agreement grants broad rights and protections to the General Partner and its affiliates. For example, they will be indemnified by the Fund against any loss or expense they incur in acting for the Fund, unless they engage in gross negligence or intentional misconduct; they are absolved of any responsibility to the Fund for any acts or omissions unless they engage in such negligence or misconduct; the General Partner is given broad powers to act for the Fund and take actions on its behalf; the General Partner has discretion to hire its affiliates to provide services to the Fund and to engage in principal transactions with the Fund; and the General Partner has authority to amend the Partnership Agreement without the consent of the investors (but on notice to them) in any manner that does not have a material adverse effect on the investors.

Lack of Investment Guidelines. The Partnership Agreement imposes no restrictions on the General Partner's investing for the Fund. The General Partner is free to invest in any instruments and to use any degree of leverage, and to alter its investment strategies (although the General Partner intends to invest in the manner summarized herein).

Dependence on Key Personnel. The Fund is dependent on the services of the personnel of the General Partner. The Fund would be adversely affected if, because of illness or other factors, their services were not available for any significant period of time.

Incentive Allocation. The General Partner's entitlement to an incentive allocation might cause it to invest more aggressively for the Fund than in the absence of such an allocation. Your capital account might be charged an incentive allocation for one or more quarters during a particular year even though the account was not profitable on an overall basis for the entire year. Because the allocation is based on unrealized as well as realized gains, the General Partner could earn an incentive allocation based on positions that were unprofitable when eventually liquidated.

**Possible Illiquidity of Investment in the Fund.** As an investor, you might not be able to liquidate your investment in the Fund. The Interests may be transferred only upon written notice to the General Partner, which must consent to the transfer. The General Partner can withhold consent in its discretion. An assignee of an Interest can become a substituted limited partner only with the consent of the General Partner. No market for the Interests will exist. Accordingly, you may have to bear the economic risk of your investment for an indefinite period of time and you might not be able to liquidate your investment in the Fund in the event of a financial emergency. The Interests have not been registered under the Securities Act or any state securities laws, and may be resold only in the event of such registration or an exemption therefrom. You must represent in the Subscription Agreement that your Interest is being acquired for investment and not for resale. While you generally have the right to withdraw capital as of the end of each month (after the initial 9 months you are invested), such rights are limited and there can be no assurance the Fund will be able to fund withdrawal requests in cash. Consequently, you should consider an investment in the Fund to be illiquid and long-term.

**Short Selling.** The Fund may sell securities short, which exposes the seller to theoretically unlimited risk due to the lack of an upper limit on the price to which the security may rise. Short selling also involves the sale of borrowed stock, and thus if the stock seller may be forced to buy the stock at a loss.[1] In addition, some traders may attempt to profit by forcing short sellers to incur a loss, or may make large purchases of a stock that has been sold short with the intent to drive up the stock price and cause the short sellers to incur losses. Such traders hope the short sellers will limit their losses by buying the stock and thus force the stock price even higher.

**Volatility of Securities Markets.** Securities prices may be volatile, and securities price movements are influenced by many unpredictable factors, such as market sentiment, inflation rates, interest rate movements and general economic and political conditions.

**Lack of Liquidity in Markets.** Despite the heavy volume of trading in securities, the markets for some securities have limited liquidity and depth. This lack of depth could be a disadvantage to the Fund, both in the realization of the prices, which are quoted, and in the execution of orders at desired prices.

**Institutional Risk.** The Fund could incur major losses due to the financial difficulty of the brokerage firm, bank or other custodian with which it deposits its assets.

**Non-U.S. Securities Markets.** The Fund may trade securities on non-U.S. as well as U.S. markets. Because non-U.S. securities markets are generally less regulated than U.S. markets, the trading on those markets presents certain risks that may not be present in trading on U.S. markets. For example, some foreign securities exchanges are "principals exchanges" in which performance is the responsibility only of the individual exchange member and not of an exchange clearing house.

---

[1] In order to initiate the short sale of a security which the Fund does not own, the Fund must borrow the securities to be sold. Borrowed stock can be called back in by the owner before the Fund is ready to close out a short position, and a squeeze may occur at that time if borrowable stock is not available. The risk of squeezes will be heightened if the Fund's short position constitutes a substantial portion of the short interest in the stock of a company having a relatively small capitalization. Squeezes also may occur if the Fund wishes to close out a short position but cannot purchase sufficient stock to do so because of lack of selling interest by third parties. Short sales must be collateralized by margin deposits. As a general rule, margin regulations currently require that short positions be backed by collateral valued initially at not less than 50% of the market value in cash or cash equivalents of the securities sold short. This percentage is subject to change by the Federal Reserve Board at any time. If the value of the collateral falls below the required percentage, the holder of the position must either post additional collateral or liquidate its short position.

Futures. Commodity futures prices can be highly volatile. Because of the low margin deposits normally required in futures trading, an extremely high degree of leverage is typical of a futures trading account. As a result, a relatively small price movement in a futures contract may result in substantial losses to the trader. Like other leveraged instruments, a futures transaction may result in losses in excess of the amount invested.

Speculative Nature of Futures Trading. Futures contracts, unlike many securities, do not pay any dividends or interest. Profits can be made in futures trading only by selling a contract at a higher price than at which is was purchased or by buying a contract at a price lower than at which is was sold.

Daily Price Limits. The daily price fluctuation limit is the maximum permitted fluctuation in the price of a futures contract for a given commodity that can occur on a commodity exchange on a given day in relation to the previous day's settlement price. Such limits are imposed by the exchanges. The exchanges prohibit the execution of trades at prices beyond the daily limit. Once the price of a futures contract has increased or decreased by an amount equal to the daily limit, positions in the contract generally cannot be taken or liquidated unless traders are willing to effect trades at or within the limit. Futures prices have occasionally moved the daily limit for several consecutive days with little or no trading. Similar occurrences could prevent the Fund from promptly liquidating unfavorable positions and subject it to substantial losses. Any factor which would make it more difficult to execute timely trades, such as significant lessening of liquidity in the futures market, would also be detrimental. The CFTC and the commodity exchanges have authority in market emergencies to suspend or otherwise limit trading.

*          *          *

You should not invest in the Fund unless you are fully able, financially and otherwise, to bear the loss of your investment in the Fund, and unless you have the background and experience to understand thoroughly the risks of your investment. The other sections of this Memorandum identify some of the risks of investing in the Fund, but this Memorandum does not attempt to identify each risk, or to describe completely those risks it does identify. If you wish to obtain more information about Fund-related risks you should contact the General Partner, which will attempt to provide such information.

§3. THE GENERAL PARTNER AND INVESTMENT MANAGER

The General Partner, Longboat Global Advisors, L.L.C., is a Florida limited liability company founded in September 2000.

The General Partner was created to fill a perceived need for better investment advice. Wall Street investment advisors have lined their pockets with profits but unfortunately the same cannot be said of their clients. Very few managers consistently outperform the popular averages, but they still collect a fee for their mediocrity. Additionally, corporate finance relationships influence many analysts' recommendations and as a result they issue relatively few sell recommendations. Aside from the conflict of interest issue this causes, it also can be hazardous to your financial health.

President and CEO Joe Beasley is the founder of Longboat Global Advisors, L.L.C. and has selected a small team, all of whom will be invaluable to the new venture. He brings 12 years of experience, hard work and important contacts and 20 years as an investor to the company. He started investing when he was 16 and began his professional career with A.G. Edwards & Sons in 1989 as a retail broker and portfolio manager. During this time, he discovered that very few money managers were able to consistently outperform the market. This mediocrity created a void, and Joe felt strongly that investors deserved better. During his career Joe had a passionate desire to seek out those managers who had the

potential for beating the market consistently and ultimately led to the creation of the company. Mr. Beasley is a graduate of Florida State University with a Bachelor of Science degree in Finance.

Mark Boucher is the Head Trader for the General Partner and works out of the Menlo Park, California office. Mr. Boucher began trading at age 16. His trading helped finance his education at the University of California at Berkeley, where he graduated with honors in Economics. Upon graduation, he founded Investment Research Associates to finance research on stock, bond, and currency trading systems. Mr. Boucher joined forces with Fortunet, Inc. in 1986, where he developed models for hedging and trading bonds, currencies, futures, and stocks. In 1989, the results of this research were published in the Fortunet Trading Course. While with Fortunet, Boucher also applied this research to designing institutional products, such as a hedging model on over $1 billion of debt exposure for the treasurer of a Fortune 500 company.

## §4. INVESTMENT STRATEGY

The Fund's primary investment strategy has a global, total-return emphasis. It will utilize a quantitative model based on fundamentals, macro-economic variable, technical tools, economic policy indicators, valuation indicators, timing systems and overall risk/reward rating to indicate whether any given stock market, currency, bond market or individual market sector on the globe presents a positive investment environment. Then assets are allocated only to those markets or sectors showing what the model considers to have the most positive environment on a risk/reward basis. When no markets show favorable risk/reward environments then only fully hedged positions or market neutral short-term deposits in the stronger currencies will be invested in. The Fund may also use futures contracts in its investment activities by utilizing a long-short strategy based on seasonal patterns and relative market strengths as projected by the same general quantitative model as applied to the futures markets.

Mr. Boucher's models evaluate over 38 different developed and emerging markets looking for the most promising investment opportunities with which to build a portfolio. The strategy is intended to be basically risk-adverse by allocating aggressively only to those areas that, according to the model, show a high likelihood of achieving positive returns according to the models, and only when a high percentage of those models signal a favorable environment. The strategy seeks broad diversification, but only among global investments that show superior potential.

The General Partner will be investing in securities based solely on the analysis of Mr. Boucher and will not be trading in a "tax-aware" manner; i.e., the factors underlying the buy and sell decisions will not include any tax ramifications of those transactions. Accordingly, the turnover rate of the Fund's portfolio may be relatively high. Generally, the General Partner will tend to sell investments as they begin to go down in value rather than hold such investments with the long-term perspective.

The General Partner may use margin in the Fund's trading up to the limits set by the Federal Reserve under Regulation T.

## §5. CAPITAL ACCOUNTS

A capital account will be established on the Fund's books for each investor. The initial value of the account will be your capital contribution to the Fund. The account will be decreased by any capital withdrawn by you from the account; any distributions made from the account to you; any incentive allocation debited from the account; and your pro-rata share of the Fund's expenses and losses (both realized and unrealized). This pro-rata share will be determined by the proportion that, at the end of the

8

relevant accounting period, the value of your account bears to the total value of the accounts of all investors ("Percentage Interest").

Your account will be increased by your Percentage Interest of the Fund's gains (both realized and unrealized) and of any dividend, interest and other income earned by the Fund.

### §6. FEES AND EXPENSES; INCENTIVE ALLOCATION

The General Partner will bear, without reimbursement by the Fund, all of the Fund's general overhead expenses, such as office, equipment and clerical staff. The expenses paid by the Fund will consist of its brokerage commissions and other transaction expenses; the General Partner's monthly management fee; professional fees such as audit, legal, accounting and tax return preparation costs; miscellaneous expenses such as regulatory filings; reimbursement of the General Partner for advancing the Fund's start-up costs; and any extraordinary expenses the Fund might incur.

The management fee is a monthly payment to the General Partner of 0.167% of the Fund's NAV as of the end of each month (2.0% on an annual basis). The fee is paid regardless of whether the Fund is profitable. The fee will be pro-rated for any months during which the General Partner does not manage the Fund's investments for the entire month.

Additionally, the Fund will allocate to the General Partner 20% of any "New High" in your capital account in the Fund as of the end of any calendar quarter. A New High is any amount by which the quarter-end value of your account, after the accrual of the management fee and all other expenses of the Fund, exceeds its "High Water Mark," which is the greater of (a) the highest previous quarter-end value of the account, or (b) the value of the account when it was first established (i.e., your capital contribution).

If you withdraw capital from your account, the amount of the withdrawal will be subtracted from the account's High Water Mark for purposes of computing whether the account achieved a New High as of a month-end. By way of general example, if the initial value of your account is $1,500,000 and you withdraw $500,000, the High Water Mark will be reduced to $1,000,000.

In addition, if you withdraw capital when your account value is below its High Water Mark, the High Water Mark will be reduced, in proportion to the ratio of the withdrawal amount to the account value. By way of general example, if the initial value of your account is $1,500,000, the value falls to $1,400,000 as of the end of the first quarter, and you then withdraw $100,000, the High Water Mark of $1,500,000 would be reduced by (a) the $100,000 withdrawal (as noted above), plus (b) an amount equal to 1/14th (the $1,400,000 quarter-end value divided by the $100,000 withdrawal amount) of the $100,000 loss in value, or approximately $7,143. The purpose of the proportionate reduction in the High Water Mark is to reflect the fact that it is more difficult for the General Partner to recoup a loss in the account if the value of the account is reduced by capital withdrawals.

If you have more than one capital account in the Fund (see the next paragraph) and you withdraw capital, the withdrawal will be deemed to be made from the first account you established.

Because a separate capital account will be established for each separate capital contribution you make to the Fund (see §5), the determination of whether your account has experienced a New High will be made with respect to each account. If you have more than one capital account, it is possible that — depending on when you invested and the timing of the Fund's profits and losses — one account could

9

experience a New High (and be charged an incentive allocation) and another account's value could be under its High Water Mark.

Because the incentive allocation is on a quarterly basis, your capital account could be charged one or more incentive allocations during a year in which the account was not profitable on an overall basis. Similarly, once an incentive allocation is charged to your capital account, the General Partner has no obligation to (and will not) refund the allocation if the account has subsequent losses.

The General Partner estimates the Fund's transaction expenses to be approximately 2.0% of its assets annually; however, those expenses will depend heavily on the Fund's NAV and market factors. The General Partner believes the brokerage commission rates paid by the Fund will be competitive with those paid by accounts of the Fund's size, but the rates might not be the lowest available. In selecting brokers for the Fund, the General Partner will consider mainly the commission rate charged by the broker, but it may also consider other factors, such as the broker's financial condition, its quality of execution and reporting and its assistance in introducing investors to the Fund. The Fund's portfolio turnover is likely to be significantly higher than that of many other investment funds, and therefore the Fund's transaction costs as a percentage of its NAV could be considerable.

The Fund's costs for professional services (including audit, legal and tax) and general administrative services are estimated as $26,000 per year, but the actual amount in any year could be significantly more or less than this amount.

The Fund's start-up costs were approximately $15,000. They were advanced by the General Partner. The Fund will reimburse the General Partner for these costs, in installments over the first 24 months following the date of this Memorandum. The amount and timing of the installments are in the General Partner's discretion.

## §7.    THE LIMITED PARTNERSHIP AGREEMENT

The Fund is governed by the Partnership Agreement, a form of which is attached hereto. Various provisions of the Partnership Agreement are summarized in other sections of this Memorandum. Set forth below is a summary of certain additional provisions. Prospective investors should read the entire Partnership Agreement before investing.

Dissolution. The Fund will continue in existence unless dissolved by the General Partner or by operation of law.

Records. The General Partner will maintain books and records for the Fund, at the General Partner's main business office. Investors may inspect and copy these materials during business hours.

Capital Contributions. The General Partner has discretion to accept capital contributions for the Fund at any time.

Distributions. The General Partner may at any time cause the Fund to make a distribution to the Investors of such amounts as the General Partner may determine. Such distributions shall be made to the Partners pro rata according to their Percentage Interests for the accounting period in which the distributions are made.

Time Devoted to Fund. The General Partner is not required to devote full time or a material portion of its time to the Fund.

Indemnification; Liability. The Fund will indemnify the General Partner and its affiliates against any loss, liability or expense they incur as the result of any act or omission relating to the Fund, unless the indemnified person engaged in gross negligence, intentional misconduct or bad faith. Similarly, the General Partner and its affiliates shall not be liable to the Fund or any investor for any loss, liability or expense as the result of any act or omission relating to the Fund, unless the General Partner or the affiliate engaged in gross negligence, intentional misconduct or bad faith.

Withdrawal, Removal of the General Partner. The General Partner may withdraw as general partner on 30 days written notice to the investors, in which event the Fund will dissolve unless within 30 days after the withdrawal any remaining general partner acting together with all the Limited Partners, elects to continue the Fund business and designate a successor general partner. The Fund will similarly dissolve within 30 days after the dissolution, removal, or bankruptcy of the General Partner, unless the investors unanimously choose to continue the Fund and elect a new General Partner. The Limited Partners may remove the General Partner on 30 days notice on the vote of 70% of the Fund's Percentage Interests. The Fund will dissolve after such removal unless within 30 days after the removal the Limited Partners elect to continue the Fund business and designate a successor general partner.

Assignment. An investor may assign his Interest only with the General Partner's discretionary consent, in which case the assignee shall become a substituted limited partner. If an investor assigns his entire Interest, he shall upon the effective date of the assignment cease to be a limited partner of the Fund for all purposes but he shall not be relieved of any obligations he may have had under the Partnership Agreement before the assignment date.

Legal Representative. If an investor dies or is adjudicated incompetent or bankrupt, his legal representative shall succeed to his Interest by the representative and shall have the status of an assignee only.

Amendment of Partnership Agreement. The Partnership Agreement may be amended by (a) the General Partner without the consent of the investors in any manner that does not materially adversely affect any investor, and (b) the General Partner and a majority in interest of the investors. The investors' consent can be obtained by negative consent. The General Partner must provide 30 days notice to the Limited Partners of any proposed changes to the Partnership Agreement which do not materially adversely affect any investor.

## §8.   TAX CONSIDERATIONS

The following is a summary, for those investors who are individuals, of some of the tax consequences of investing in the Fund. The summary is not intended as tax advice; you should consult with your own tax advisor before investing. Also, the summary is based on current tax law and interpretations, which could change at any time, possibly with retroactive effect.

Status of the Fund as a Partnership. The Fund will be taxed as a partnership and thus will not pay federal income tax. The Fund will not be taxed as a "publicly-traded partnership."

Taxation of Investors on Fund Profits and Losses. As a limited partner of the Fund, you will have to pay tax on your share of the Fund's income and gains. You will have to include that share in your taxable income whether or not you have withdrawn any capital from the Fund. The Fund will send you an annual schedule of your share of the Fund's income, gains, deductions and losses. The Fund will generally allocate these items to each investor on a pro rata basis (i.e., based on his proportionate

ownership of the Fund). However, when investors withdraw capital, the Fund intends to allocate its capital gains and losses to investors for tax purposes so as to eliminate any difference between the withdrawal proceeds and the investor's tax account.

Limited Deductibility of Fund Losses and Deductions. You cannot deduct your share of Fund losses or deductions in an amount exceeding your tax basis in your Interest, which is generally the amount you paid for the Interest reduced (but not below zero) by your share of any Fund distributions, losses and deductions, and increased by your share of the Fund's income and gains.

Limited Deductibility for Certain Expenses. Individual taxpayers are subject to significant limitations on their ability to deduct investment advisory expenses and other expenses of producing income. Whether your share of the management fees paid by the Fund will be subject to these limitations will generally depend on whether the Fund is engaged in a trade or business activity for federal income tax purposes, or an investor activity. The Fund will take the position it is so engaged but this position could be challenged by the Internal Revenue Service ("IRS"). If such a challenge were successful, your ability to deduct these management fees would be limited. Also, the IRS could assert that the incentive allocation is an investment advisory expense rather than a profit "allocation," and thus subject to these limitations.

Unrelated Business Taxable Income. Investors who are tax-exempt will not be required to pay tax on their share of Fund income or gains, provided the investor did not use borrowed funds to purchase its Interest. The Fund does not intend to use borrowed money (i.e., margin) to purchase financial instruments.

IRS Audits of the Fund and the Investors. If the IRS were to audit Fund-related items, it would do so at the Fund rather than the investor level. The General Partner is the Fund's "tax matters partner" with general authority to determine the Fund's responses to an audit. If a Fund audit results in an adjustment, all investors might have to pay additional taxes plus interest and penalties, and could themselves be audited.

State and Local Taxes. In addition to the federal income tax consequences described above, the Fund and its investors may be subject to various state, local and other taxes.

§9.   EMPLOYEE BENEFIT PLAN CONSIDERATIONS

The Fund may accept contributions from "benefit plan investors" as defined in ERISA (the Employee Retirement Income Security Act of 1974, as amended), which are "employee benefit plans" as defined in ERISA and "plans" as defined in Section 4975 of the Code (collectively, "Plans"). Plans include corporate pension and profit-sharing plans, SEP ("simplified employee pension") plans, Keogh plans for self-employed individuals, governmental plans, and IRAs (individual retirement accounts described in Code Section 408). If Plans hold 25% or more of the Interests (but generally excluding the Interests of the General Partner or any affiliate thereof), the Fund's underlying assets would be "plan assets" under ERISA with respect to those investors that are Plans subject to ERISA or the Code. (The 25% level is measured each time capital is added to or withdrawn from the Fund.)

Since Plan investments in the Fund may exceed the 25% level, a person considering investing in the Fund on behalf of a Plan subject to ERISA or the Code should evaluate the plan asset consequences of the investment, including the risk that unintended prohibited transaction or fiduciary duty delegation consequence may arise under ERISA or the Code. Whether or not the Fund's underlying assets are plan

assets under ERISA, such persons should consult with their counsel as to the ERISA consequences of an investment in the Fund by a Plan.

CH01/12111691.3

Ex. #2

**Exhibit A**

AGREEMENT OF LIMITED PARTNERSHIP OF
PIRANHA CAPITAL, L.P.

**THE SECURITIES REPRESENTED BY AND ISSUED PURSUANT TO THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER ANY FEDERAL OR STATE SECURITIES LAW AND MAY NOT BE TRANSFERRED WITHOUT REGISTRATION UNDER THOSE LAWS EXCEPT PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THOSE LAWS.**

# AGREEMENT OF LIMITED PARTNERSHIP

## TABLE OF CONTENTS

| | | |
|---|---|---|
| Article 1. | Definitions | 1 |
| Article 2. | Organization | 4 |
| §2.1. | Formation | 4 |
| §2.2. | Name | 4 |
| §2.3. | Principal Place of Business | 4 |
| §2.4. | Agent for Service of Process | 4 |
| §2.5. | Purposes and Powers | 4 |
| §2.6. | Term | 5 |
| Article 3. | Capital Contributions; Classes of Interests; Admission of Partners | 5 |
| §3.1. | Issuance of Limited Partnership Interests | 5 |
| §3.2. | Classes of Interests. | 5 |
| §3.3. | Contributions of Limited Partners; Admission of Additional Limited Partners | 5 |
| §3.4. | Contributions by General Partner | 6 |
| §3.5. | Form and Timing of Contributions | 6 |
| Article 4. | Capital Accounts; Allocations | 6 |
| §4.1. | Opening Capital Accounts | 6 |
| §4.2. | Closing Capital Accounts | 6 |
| §4.3. | Incentive Allocation | 7 |
| §4.4. | Special Allocations | 7 |
| §4.5. | Tax Allocations | 7 |
| Article 5. | Records and Accounting; Reports | 8 |
| §5.1. | Records and Accounting | 8 |
| §5.2. | Accounting Period; Accounting Methods | 8 |
| §5.3. | Net Asset Value (NAV). | 9 |
| §5.4. | Valuation of Assets | 9 |
| §5.5. | Reports | 10 |
| §5.6. | Tax Returns; Withholding | 10 |
| §5.7. | Tax Elections | 11 |
| Article 6. | Withdrawals and Distributions | 11 |
| §6.1. | Withdrawals from Capital Accounts. | 11 |
| §6.2. | Lock-Out Period | 11 |
| §6.3. | Suspension of Withdrawal Right | 11 |
| §6.4. | Effect of Complete Withdrawal | 12 |
| §6.5. | Distributions | 12 |
| §6.6. | Limitations; Form of Distributions | 12 |
| §6.7. | Withdrawals by the General Partner | 12 |
| §6.8. | Required Withdrawal | 12 |
| Article 7. | Management | 12 |
| §7.1. | Authority of the General Partner | 12 |

§7.2.    Activities of General Partner and Affiliates; Interested Partners ........................... 12
§7.3.    Advisory and Consulting Services ....................................................................... 13
§7.4.    Reliance by Third Parties. ................................................................................... 13
§7.5.    Registration of Assets ......................................................................................... 13

Article 8.    Expenses. .......................................................................................................... 13
§8.1.    In General. ........................................................................................................... 13
§8.2.    Organizational and Offering Expenses ............................................................... 14
§8.3.    Special Services .................................................................................................. 14

Article 9.    Rights and Obligations of the Limited Partners ................................................. 14
§9.1.    In General. ........................................................................................................... 14
§9.2.    Assignments. ....................................................................................................... 14
§9.3.    Death, Bankruptcy, or Incapacity of Limited Partner .......................................... 14

Article 10.   Dissolution and Termination of the Fund .......................................................... 15
§10.1.   Dissolution. .......................................................................................................... 15
§10.2.   Liquidation and Distribution. ................................................................................ 15
§10.3.   Termination .......................................................................................................... 15

Article 11.   Withdrawal and Removal of General Partner ..................................................... 15
§11.1    Withdrawal ........................................................................................................... 15
§11.2.   Removal ............................................................................................................... 16

Article 12.   Exculpation and Indemnification ....................................................................... 16
§12.1    Exculpation. ......................................................................................................... 16
§12.2.   Indemnification .................................................................................................... 16

Article 13.   Miscellaneous ................................................................................................... 16
§13.1.   Appointment of General Partner as Attorney-in-Fact .......................................... 16
§13.2.   Signatures; Amendments. ................................................................................... 16
§13.3.   Notices and Addresses ....................................................................................... 17
§13.4.   Governing Law ..................................................................................................... 17
§13.5.   Successors and Assigns. ..................................................................................... 17
§13.6.   Counterparts ........................................................................................................ 17
§13.7.   Modifications To Be In Writing ............................................................................ 17
§13.8.   Interpretation. ...................................................................................................... 17
§13.9.   Validity And Severability ...................................................................................... 17
§13.10.  Statutory References ........................................................................................... 18
§13.11.  Partition Action .................................................................................................... 18

AGREEMENT OF LIMITED PARTNERSHIP OF
PIRANHA CAPITAL, L.P.

THIS AGREEMENT OF LIMITED PARTNERSHIP (the "Agreement") is entered into as of _____, 20__ by and among Longboat Global Advisors, L.L.C., a Florida limited liability company, as General Partner, and those persons who shall execute counterparts of this Agreement personally or by attorney-in-fact as Limited Partners.

**Article 1.      Definitions**

When used in this Agreement, the following terms have the following meanings:

§1.1.   "Accountants" -- such firm of independent certified public accountants as may be engaged from time to time by the General Partner.

§1.2.   "Accounting Period" -- has the meaning in §5.2(a).

§1.3.   "Act" -- means the Delaware Revised Uniform Limited Partnership Act, as amended from time to time.

§1.4.   "Additional Limited Partner" -- means any person admitted to the Fund as a Limited Partner after the effective date of this Agreement under §3.3.

§1.5.   "Affiliate" -- means with respect to the specified Person:  (a) any Person that directly or indirectly through one or more intermediaries controls, alone or through an affiliated group, is controlled by, or is under common control with, the specified Person, (b) any Person that is an officer, director, partner or trustee of, or serves in a similar capacity with respect to, the specified Person (or an Affiliate of the specified Person) or of which the specified Person is an officer, director, partner or trustee, or with respect to which the specified Person serves in a similar capacity, (c) any Person that, directly or indirectly, is the beneficial owner of 10% or more of any class of equity securities of, or otherwise has a substantial beneficial interest in, the specified Person, or of which the specified Person is directly or indirectly the owner of 10% or more of any class of equity securities or in which the specified Person has a substantial beneficial interest, or (d) any relative or spouse of the specified Person.

§1.6.   "Agreement" -- means this Agreement of Limited Partnership, as amended from time to time.

§1.7.   "Bankruptcy" -- means, with respect to a Person:  (i) the commencement against him of a proceeding for any relief under any bankruptcy or insolvency law, or any law relating to the relief of debtors, readjustment of indebtedness, reorganization, arrangement, composition, or extension of debts, provided the proceeding shall not have been dismissed, nullified, stayed (but only so long as the stay shall continue in force), or otherwise rendered ineffective within 90 days after the commencement of the proceeding; (ii) the commencement by the Person of a proceeding for any relief under any such law; (iii) a decree or order of a court of competent jurisdiction for the appointment of a receiver, liquidator, or trustee or assignee in bankruptcy or insolvency of the Person or of a substantial part of his property, or for the winding up or liquidation of his affairs, which decree or order remains in force undischarged and unstayed

for 90 days; or (iv) a general assignment by the Person for the benefit of creditors or the admission by him in writing of his inability to pay his debts generally as they become due.

§1.8. "Book/Tax Disparity" —means the difference between a Partner's Capital Account balance and his Tax Capital Account maintained strictly in accordance with tax accounting principles.

§1.9. "Capital Account" or "Account" -- means the Capital Account in the Fund for each Partner established under Article 4.

§1.10. "Capital Contributions" -- means, with respect to any Partner as of any date, the total amount of money and the fair market value of property he has contributed to the equity of the Fund (including, in the case of an Assignee or Substitute Partner, contributions made by any prior holder of the Interest held by him as of such date).

§1.11. "Certificate" -- means the Certificate of Limited Partnership filed on behalf of the Fund in Delaware, as amended from time to time.

§1.12. "Class of Interests" -- has the meaning in §3.2.

§1.13. "Closing Capital Account" -- has the meaning in §4.2.

§1.14. "Closing Date" -- means the date the Subscription Agreement of a Partner is accepted by the General Partner.

§1.15. "Code" -- means the Internal Revenue Code of 1986, as amended from time to time, or any successor thereto.

§1.16. "Disability" -- means, with respect to a Person, a state or condition of incapacitated legal disability or, through illness, age or other cause, an inability to give reasoned consideration to financial matters.

§1.17. "Event of Withdrawal" -- means, with respect to the General Partner, the cessation of its status as a Partner as a result of death, dissolution, removal, Bankruptcy, incapacity, or any other reason, other than the dissolution of the Fund, or any other event requiring the withdrawal of the General Partner under the Act.

§1.18. "Financial Instrument" -- means any: debt or equity security; futures contract or other commodity interest; forward contract; swap or other notional principal contract; any other instrument, product, right or article; or any option on the foregoing.

§1.19. "Fiscal Year" -- means the calendar year. (The Fund's first Fiscal Year shall start when the Fund begins operations and end on the succeeding December 31. The Fund's last Fiscal Year shall end when the Fund dissolves and terminates.)

§1.20. "Fund" -- means the limited partnership formed pursuant to the Certificate and this Agreement.

§1.21. "Fund Percentage" -- means, with respect to each Partner for an Accounting Period, his Opening Capital Account for the Accounting Period, divided by the sum of the Opening Capital Accounts of all Partners for that Accounting Period. The sum of the Fund Percentages shall equal 100.

2

§1.22. "General Partner" -- means Longboat Global Advisors, L.L.C., any successor thereto, or any Affiliate thereof that the General Partner appoints, on prior written notice to the Limited Partners, as its replacement as general partner of the Fund.

§1.23. "Incentive Allocation" -- has the meaning in §4.3.

§1.24. "Interest" -- means the entire ownership interest of a Partner in the Fund at any time, including his right to any benefit to which he may be entitled under this Agreement and the Act, together with his obligations to comply with any term hereof. (The percentage ownership interest in the Fund represented by any Partner's Interest shall equal his Fund Percentage.) Reference to the holders of a majority or specified percentage in Interest of the Limited Partners means Limited Partners whose Fund Percentages represent more than 50% (in the case of a majority in Interest) or the specified percentage (in other cases) of the Fund Percentages of all Limited Partners. Reference to a Limited Partnership or General Partnership Interest means the Interest of a Limited Partner or General Partner, as such.

§1.25. "Legal Counsel" -- means such legal counsel as shall be engaged from time to time by the General Partner for the Fund, including in-house legal counsel for the General Partner or its Affiliates.

§1.26. "Limited Partner" -- means, as of any date, any or all of the Persons who have been admitted as and continue to be limited partners of the Fund as of such date.

§1.27. "May" -- when referring to an act or decision to be made by the General Partner means that the General Partner shall make the act or decision in its sole and absolute discretion.

§1.28. "Memorandum" -- means the Confidential Private Placement Memorandum prepared by the Fund with respect to the Interests, as supplemented or amended from time to time.

§1.29. "Net Asset Value" ("NAV") -- has the meaning in §5.3.

§1.30. "Net New Profits" -- means, with respect to a Limited Partner for any calendar quarter, the sum of the increases in NAV allocated to the Limited Partner under §4.2(a) for each Accounting Period during that period, reduced (but not below zero) by (i) the sum of the total decreases in NAV allocated to him for each Accounting Period during that period pursuant to §4.2(a), and (ii) any excess of the sum of the total decreases in NAV allocated to the Limited Partner pursuant to §4.2(a) for all prior quarters over the sum of the total increases in NAV allocated to the Limited Partner pursuant to §4.2(a) for such prior quarter.

If a Limited Partner withdraws capital as of a date when the sum of the total NAV decreases in (i) and (ii) exceeds the sum of the total NAV increases for the current calendar quarter, such excess amount shall be reduced -- solely for purposes of calculating Net New Profits -- by multiplying the excess amount by the fraction equal to the withdrawal amount divided by the Limited Partner's Closing Capital Account immediately before the withdrawal.

If a Limited Partner has more than one Capital Account, Net New Profits shall be calculated separately for each Capital Account.

§1.31. "Opening Capital Account" -- has the meaning in §4.1.

§1.32. "Partner" -- means as of any particular time any Person who is at that time a General Partner or Limited Partner.

3

§1.33. "Person" -- means any natural person, corporation, firm, joint venture, partnership, limited liability company, trust, unincorporated organization, government, or any department, political subdivision or agency of a government.

§1.34. "Pro Rata" -- means in proportion to the Fund Percentage of each Partner as compared to the Fund Percentages of all Partners.

§1.35. "Securities Act" -- means the Securities Act of 1933, as amended.

§1.36. "Subscription Agreement" -- means, with respect to a Limited Partner, the Subscription Agreement of that Limited Partner in the form attached as an Exhibit to the Memorandum.

§1.37. "Substitute Partner" -- means a Person to whom an Interest has been assigned and who has been admitted to the Fund as a General Partner ("Substitute General Partner") or Limited Partner ("Substitute Limited Partner") under this Agreement.

§1.38. "Tax Capital Account" --means the capital account maintained for a Partner under 4.5(b).

§1.39. "Treasury Regulations" -- means the regulations promulgated by the Department of the Treasury with respect to a section of the Code, whether in proposed, temporary or final form, as from time to time amended, or any successors thereto.

§1.40. "Valuation Date" -- means, with respect to any Accounting Period, the last day of the Accounting Period.

§1.41. "Withdrawal Notice" -- means a notice required to be delivered by a Limited Partner who desires to withdraw under Article 6.

§1.42. "Withdrawing Partner" -- means any Partner who voluntarily makes a withdrawal from his Capital Account under Article 6.

## Article 2.    Organization

§2.1.   Formation.   The parties hereby form Piranha Capital, L.P. pursuant to the Act and this Agreement.

§2.2.   Name.   The business of the Fund shall be conducted under the name "Piranha Capital, L.P." or under such other name as the General Partner may determine.

§2.3.   Principal Place of Business.   The Fund's principal place of business is Suite 213, 417 12th Street West, Bradenton, Florida 34205, phone (941) 747-7711, facsimile (941) 747-7712. The General Partner may on written notice to the Partners change the location of the Fund's principal place of business, or establish additional places of business.

§2.4.   Agent for Service of Process.   The Fund's agent for service of process shall be Corporation Service Company, whose address is 1013 Centre Road, Wilmington, Delaware 19805.

§2.5.   Purposes and Powers.   The Fund is organized for the purpose of seeking capital appreciation and current return through investments in Financial Instruments. In furtherance thereof, the Fund is authorized to: (a) purchase, hold, sell, write, exchange, transfer, pledge, and otherwise invest and

trade in any Financial Instrument, whether within or without the United States; (b) exercise all rights, powers, privileges, and other incidents of investment in, ownership or possession with respect to any Financial Instrument or other Fund asset; and (c) enter into, make and perform, all contracts and other undertakings, and engage in all other activities and transactions, as the General Partner may deem appropriate for carrying out the purposes of the Fund.

§2.6.   Term.  The Fund shall continue in existence until dissolved under §10.1.

**Article 3.       Capital Contributions; Classes of Interests; Admission of Partners**

§3.1.   Issuance of Limited Partnership Interests.  The General Partner may offer, issue, and sell interests of limited partnership (the "Interests") in the Fund in such manner as it may determine (e.g., through selling agents or directly by the General Partner).

§3.2.   Classes of Interests.  The General Partner may divide the Interests into one or more classes (each, a "Class").  Each Class shall have the same capital withdrawal, voting and other rights, and the same duties, as any other Class, except that the General Partner may establish different management fees, incentive allocations and leveraging levels for different Classes.  The General Partner may also provide that each Class shall participate only in the assets that are identified by the Fund as assigned to the particular Class.  Accordingly, the General Partner may allocate to the Capital Accounts of the Partners assigned to a Class only those NAV increases and decreases in the particular Fund assets assigned to the Class.  Such allocations shall be made according to the proportion that the Capital Account of each Partner assigned to the Class bears to the Capital Accounts of all Partners assigned to the Class.  If an asset is assigned to more than one Class, the NAV increase or decrease in the asset shall be allocated to the Classes in proportion to the participation of each Class in the asset.

The General Partner may permit a Partner to join more than one Class, and to designate the portion of his Capital Contribution that is allocated to each Class; the General Partner may permit a Partner to transfer between Classes (and may charge the Partner reasonable transfer charges); in the case of any Fund asset that the General Partner determines should not be allocated to a particular Class (e.g., a cash reserve), the General Partner may determine the basis on which the asset is allocated between or among the Classes; the General Partner may determine how any Fund liability shall be allocated between or among the Classes.

The General Partner may provide that the debts, liabilities and obligations with respect to a particular Class shall be enforceable only against the Fund assets of that Class and not against the Fund assets generally.

§3.3.   Contributions of Limited Partners; Admission of Additional Limited Partners.

(a)       Each Limited Partner shall have contributed to the capital of the Fund the amount set forth in his Subscription Agreement as of the applicable Closing Date.  The General Partner shall maintain in the Fund's records a schedule setting forth the name, address and Capital Contributions of each Partner.

(b)       The General Partner may (i) allow Partners to make additional capital contributions to the Fund, and (ii) admit one or more Additional Limited Partners, effective at any time selected by the General Partner.  Each Additional Limited Partner shall execute an appropriate counterpart to this Agreement or otherwise agree in writing to be bound by the terms hereof.  The admission of an

Additional Limited Partner shall not dissolve the Fund. Except as expressly provided herein, no Partner shall be required to make any additional Capital Contribution to the Fund.

§3.4.   Contributions by General Partner.   The General Partner may make such capital contributions to the Fund as it determines. Those Capital Contributions shall be treated in the same manner as Capital Contributions of Limited Partners. The Capital Accounts of the General Partner and its Affiliates will not be charged any management fee or Incentive Allocation.

§3.5.   Form and Timing of Contributions.   All amounts to be contributed by a Limited Partner shall be paid in immediately available funds, or securities acceptable to the General Partner, in such manner as specified by the General Partner.

**Article 4.      Capital Accounts; Allocations**

§4.1.   Opening Capital Accounts.   An Opening Capital Account shall be established on the Fund's books for each Partner as of the beginning of each Accounting Period, for each separate Capital Contribution of the Partner made during a Fiscal Year. The Opening Capital Account as of the beginning of the Accounting Period in which the Partner is admitted or makes an additional Capital Contribution shall be his Capital Contribution as of that date. The Opening Capital Account as of the beginning of each subsequent Accounting Period shall be the Partner's Closing Capital Account for the immediately preceding Accounting Period (determined under §4.2), decreased by the amount of any withdrawals made by the Partner as of the end of the preceding Accounting Period and by the amount of any distribution made to him during such Accounting Period under Article 6.

§4.2.   Closing Capital Accounts.   A Closing Capital Account shall be established on the Fund's books for each Partner as of the end of each Accounting Period. Its amount shall be determined by adjusting the Opening Capital Account of the Partner for the Accounting Period as follows:

(a)      First, any increase or decrease in Fund NAV for the Accounting Period shall be credited or debited (as the case may be) Pro Rata to the individual Opening Capital Accounts of all Partners, including the General Partner.

(b)      Second, in the case of any Accounting Period which ends on the last day of any calendar quarter, any Incentive Allocation with respect to the Capital Account of a Limited Partner (determined under §4.3) shall be debited to his Opening Capital Account and credited to the Opening Capital Account of the General Partner. If a Limited Partner withdraws any capital from his Capital Account before the end of a calendar quarter, any Incentive Allocation shall be calculated as if the withdrawal date was the end of the calendar quarter and the Incentive Allocation shall be debited to the Closing Capital Account prior to the payment of the withdrawal proceeds.

§4.3.   Incentive Allocation.   The Incentive Allocation for each Capital Account shall be 20% multiplied by the Account's Net New Profits for the calendar quarter.

§4.4.   Special Allocations.   Notwithstanding §4.2, the following special allocations shall be made:

(a)      Hot Issues.   To enable the Fund to participate in a public offering that trades at a premium in the secondary market (a "Hot Issue"), the General Partner may establish at any brokerage firm a securities trading account that is authorized to participate in Hot Issues and specially to allocate to all Partners other than Prohibited Persons (as defined below) the profits and losses that relate to that special

account. Securities allocated to that special account shall not be transferred into an account in which Prohibited Persons participate. A "Prohibited Person" shall mean any person described in paragraphs (1) through (5) of the Free Riding and Withholding Interpretation of the National Association of Securities Dealers, Inc., but the General Partner may distinguish between Prohibited Persons as identified in paragraphs (3) and (4) of the Interpretation and Prohibited Persons as identified in paragraphs (1), (2) and (5) thereof. A Limited Partner who is a "Prohibited Person" must so indicate on his Subscription Agreement.

      (b)   <u>Designated Investments</u>. The General Partner may from time to time designate certain Fund investments ("Designated Investments") as investments in which only those Partners who were Partners as of the date of designation shall participate. A Partner's participation in a Designated Investment shall continue, for both financial and tax purposes, until the Designated Investment is liquidated, irrespective of whether the Partner remains a Partner in the Fund. Unless the General Partner may otherwise determine, Designated Investments shall be accounted for separately from all other investments. The economic terms on which the Partners participate in Designated Investments shall be the same as contemplated herein based on the Partners' Fund Percentages as of the date of designation. However, such participation will be postponed in respect of determining any Incentive Allocation due until the Designated Investment is liquidated, and the Incentive Allocation will then be calculated independently of the Partners' participation in other investments (unless the General Partner determines in good faith that it would be inequitable to do so). Expenses shall, however, be charged on a current basis in respect of Designated Investments, in such manner as the General Partner deems equitable.

     §4.5.   <u>Tax Allocations</u>. The tax allocations prescribed by this Section shall be made to each Partner. If all or a portion of a Limited Partner's Interest has been assigned (with the General Partner's consent), the allocation shall be made without regard to the assignment. However, in the year of assignment the allocations shall be divided between the assignor and assignee based on the number of days each held the assigned Interest.

      (a)   In the case of a Partner who invested in the Fund after the start of a fiscal year, the allocation of profit and loss to him shall not exceed the maximum allocation permitted under Code Subchapter K to limit retroactive allocations. That maximum shall be determined by the General Partner, which shall be binding on all Partners.

      (b)   The Fund shall maintain for each Partner a separate "Tax Capital Account" in accordance with Federal income tax accounting principles. Each Partner's Tax Capital Account shall be increased by (i) the cash amount of all Capital Contributions made by him to the Fund and (ii) all items of Fund income and gain (including income and gain exempt from tax) allocated to him under §4.5(c) and (d), and decreased by (iii) the cash amount of all actual and deemed distributions of cash or property made to him hereunder and (iv) all items of Fund deduction and loss allocated to him under §4.5(c) and (d).

      (c)   Gains and losses shall be allocated among the Partners so as to eliminate, to the extent possible, any Book/Tax Disparity. Subject to §4.5(c), in each Fiscal Year items of income, deduction, gain, loss or credit that are recognized for income tax purposes shall be allocated among the Partners so as to reflect equitably amounts credited to or debited against the Capital Account of each Partner, whether in that Fiscal Year or in prior Fiscal Years. The Fund shall thus maintain records that show the extent to which the Capital Account of each Partner shall, as of the last day of each Fiscal Year, be comprised of amounts that have not been reflected in his taxable income. To the extent deemed feasible and equitable by the General Partner, taxable income and gains in each Fiscal Year shall be allocated

among the Partners who have enjoyed the related credits, and items of deduction, loss and credit in each Fiscal Year shall be allocated among the Partners who have borne the burden of the related debits.

      (d)    Notwithstanding any of the foregoing provisions to the contrary, if a Partner withdraws capital during a Fiscal Year, the General Partner may allocate taxable income and loss, as follows:

      (i)    First to each Partner who has withdrawn all or part of his Capital Account in that Fiscal Year, so as to eliminate any Book/Tax Disparity of the Partner's Capital Account.

      (ii)    Second, as provided in §4.5(b).

      (e)    In the case of investments whose financial consequences are allocated to only a specific group of Partners, the General Partner shall allocate the items of income, gains, losses and deductions (ordinary, short-term and long-term) attributable to those investments so as equitably to allocate all such items among those Partners.

      (f)    In accordance with Code Section 704(c) and the related regulations, income, gain, loss and deduction with respect to any asset contributed to the capital of the Fund will, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted basis to the Fund of the asset for federal income tax purposes and the fair market value of the asset on the date of contribution.

      (g)    Any elections or other decisions relating to allocations under this Section will be made in a manner that the General Partner may determine reasonably reflects the purpose and intent of this Agreement.

      (h)    The tax allocations in this Section are intended to allocate items of Fund income, gains, losses and deductions (ordinary, short-term and long-term) in accordance with Code Sections 704(b) and 704(c) including the requirements set forth therein regarding a "Qualified Income Offset."

**Article 5.    Records and Accounting; Reports**

    §5.1.    <u>Records and Accounting</u>.  The General Partner shall maintain records and books of account of the business of the Fund at the Fund's principal office. Each Partner or its duly authorized representative may reasonably inspect and copy (at its expense) those books and records. However, a Limited Partner shall not disclose (and will require its representatives to forebear from disclosing) to third parties any information of a proprietary nature obtained in the inspection.

    §5.2.    <u>Accounting Period; Accounting Methods</u>.

      (a)    An Accounting Period shall start on the day after the end of the preceding Accounting Period and end on the earlier of December 31 of that year, the effective date of any withdrawal from the Fund, or the day before the effective day of any Capital Contribution. The General Partner may also establish other Accounting Periods.

      (b)    The Fund shall keep its books and records in accordance with this Agreement, under the accrual method of accounting and, as to matters not specifically covered herein, in accordance with generally accepted accounting principles. All matters concerning accounting practices not specifically



provided for herein shall be determined by the General Partner in good faith. Such determination shall be final and conclusive as to all Partners. The Fund's organizational and other start-up expenses may be expensed on a cash basis, rather than in accordance with generally accepted accounting principles.

§5.3.    Net Asset Value (NAV). The Fund's NAV shall be determined as of each Valuation Date. The increases and decreases in NAV for each Accounting Period shall be measured by reference to the NAV of the Fund as of the Valuation Date for that Accounting Period and as of the Valuation Date for the preceding Accounting Period. The Fund NAV as of any Valuation Date means the value of the Fund's assets (determined under §5.4) minus its liabilities, determined as of the close of business on that Valuation Date. For this purpose:

(a)    The Fund's assets as of any date shall include: (i) all cash on hand or on deposit, including any interest accrued thereon; (ii) all bills, demand notes, and accounts receivable (including proceeds of Financial Instruments sold but not delivered); (iii) all instruments owned or contracted for by the Fund; (iv) all stock dividends, cash dividends, and cash distributions receivable by the Fund (the General Partner may make adjustments with regard to fluctuations in the market value of Financial Instruments caused by trading ex-dividend, ex-rights, or by similar practices); (v) all interest accrued on any interest-bearing Financial Instrument except to the extent that the same is included or reflected in the valuation of the Financial Instrument; (vi) unamortized organization expenses and similar costs; and (vii) all other assets of every kind and nature, including prepaid expenses.

(b)    The liabilities of the Fund as of any date shall include: (i) all outstanding loans, bills and accounts payable; (ii) accrued or payable expenses; (iii) the current market value of all short sale obligations; and (iv) all other liabilities. The General Partner may treat estimates of expenses that are incurred on a regular or recurring basis over yearly or other periods as accruing in equal proportions over the period.

(c)    The General Partner may establish such reserves for unknown or unfixed liabilities or contingencies as it may determine.

(d)    The General Partner may treat any liability or expenditure which becomes fixed or is incurred in an Accounting Period subsequent to the Accounting Period to which the liability or expenditure relates as either (i) arising in the Accounting Period in which the liability becomes fixed or the expenditure is made or (ii) arising in the prior Accounting Period. In that case the liability or expenditure shall be charged to Persons who were Partners during that prior Accounting Period (whether or not the Persons are Partners during the Accounting Period in which the liability is fixed or the expenditure is incurred) Pro Rata for that prior Accounting Period.

§5.4.    Valuation of Assets. For all purposes of this Agreement, including the determination of NAV and the value of Capital Accounts, the assets of the Fund shall be valued as follows:

(a)    Securities traded on a national securities exchange shall be valued at the their closing price on the Valuation Date or if the Valuation Date is not a trading day, on the trading day that immediately precedes the Valuation Date on the exchange where the securities are principally traded or on a consolidated tape which includes the exchange, whichever shall be selected by the General Partner. If there are no sales on such dates on the exchange or consolidated tape, the securities shall be valued at the mean between the average last "bid" and "asked" prices at the close of trading on the Valuation Date, or if the Valuation Date is not a trading date, on the trading date that immediately precedes the Valuation Date on the national securities exchange where the securities are principally traded (or on the consolidated tape if

9



"bid" and "asked" prices are reported on the consolidated tape). However, in no case shall a convertible security be valued at less than its conversion value as determined by the closing price of the underlying security into which it is convertible.

(b)  Securities traded over-the-counter shall be valued at the closing price on the Valuation Date as reported by the National Association of Securities Dealers Automated Quotations ("NASDAQ") National Market System. If such sales prices are not available, the securities shall be valued at the average mean between the "bid" and "asked" prices as of the close of trading on the Valuation Date or if the Valuation Date is not a trading date, as of the close of trading that immediately precedes the Valuation Date as reported by NASDAQ (or if such prices are not reported by NASDAQ, as reported by the National Quotation Bureau, Inc.) or may be determined from any reliable source selected by the General Partner.

(c)  Short-term money market instruments and bank deposits shall be valued at cost plus accrued interest to date.

(d)  The foregoing valuations may be modified by the General Partner to reflect restrictions upon marketability or other factors affecting valuation. Without limiting the foregoing, the General Partner's valuation may reflect the amounts invested by the Fund in the asset, notwithstanding that the amounts may not represent the asset's market value. All determinations of values by the General Partner shall be final and conclusive as to all Partners.

§5.5.  Reports.

(a)  As soon as practicable after the end of each interim reporting period designated by the General Partner, the General Partner shall cause to be delivered to each Person who was a Partner at any time during the period a report setting forth: (i) an unaudited statement of the NAV of the Fund for the period, and (ii) such other financial reports and other information as the General Partner may consider appropriate.

(b)  As soon as practicable after the end of each Fiscal Year, the General Partner will cause to be delivered to each Person who was a Partner during the Fiscal Year a report on the Fund's operations during the year. The report shall not be audited unless the General Partner so determines or a majority in Interest of the Limited Partners so requests.

§5.6.  Tax Returns; Withholding.

(a)  The General Partner shall cause federal, state and local income tax returns for the Fund to be prepared and filed with the appropriate authorities. The General Partner may determine the accounting methods and conventions under the tax laws of the U.S., the several states, and other relevant jurisdictions as to the treatment of Fund income, gain, loss, deduction, and credit or any other method or procedure relating to the preparation of those returns. The General Partner may cause the Fund to make any tax election permitted by those laws, including the election referred to in Code section 754.

(b)  As soon as reasonably practicable after the end of each Fiscal Year, the General Partner shall cause to be delivered to each Person who was a Partner during the Fiscal Year such tax information and schedules as shall be necessary for his preparation of his federal, state, and local income tax return.

(c) Notwithstanding any provision hereof to the contrary, the General Partner may withhold and pay over to the Internal Revenue Service or any other taxing authority, pursuant to Code Sections 1441, 1442, 1445, 1446 and any other provisions of the Code or of state law, the amounts the Fund may be required to withhold under those provisions or may be required to pay to any state taxing authority relating to a Partner. Each Partner shall furnish the General Partner with such information, forms and certifications as it may require and as are necessary to comply with the regulations governing the obligations of withholding tax agents, as are necessary with respect to any withholding taxes imposed by countries other than the Untied States. Each Partner represents that the information and forms furnished by him shall be true and accurate in all respects and agrees to indemnify the Fund and the General Partner for his allocable share of any applicable tax of any type (including any liability for penalties, additions to tax or interest) attributable to his share of Fund income or the distributions to him. Any amounts withheld and paid over by the General Partner with respect to a Partner shall be treated as a cash distribution to him and shall be charged as of the date of payment against his Capital Account.

§5.7. Tax Elections. The General Partner is the "Tax Matters Partner" for the Fund for all purposes under the Code.

Article 6. Withdrawals and Distributions

§6.1. Withdrawals from Capital Accounts.

(a) Except as provided in §§6.2 and 6.3, a Partner may withdraw, as of the end of any month, all or any portion of its Capital Account by giving 45 business days prior written notice (the "Withdrawal Notice"). In the case of a partial withdrawal, the aggregate NAV of the Withdrawing Partner's Capital Accounts remaining in the Fund must be at least $250,000, unless the General Partner otherwise permits. The General Partner may permit withdrawals as of dates other than month-ends, and on less than 45 business days notice.

(b) A Withdrawing Partner shall be entitled to receive an amount equal to the lesser of the amount set forth in his Withdrawal Notice or his Closing Capital Account for the Accounting Period in which the withdrawal is effective. Except to the extent provided elsewhere herein, the Fund shall to the extent practicable distribute not less than 95% of the estimated amount withdrawn pursuant to this §6.1 within 10 days after the effective date of the withdrawal. Final settlement of the full amount of the distribution shall be made as promptly as the General Partner determines is feasible. The withdrawing Partner shall not be entitled to interest on the withheld amount. The General Partner may pay withdrawal proceeds in marketable securities rather than cash.

§6.2. Lock-Up Period. A Withdrawing Partner may not withdraw any portion of his Capital Account prior to 6 months after the Closing Date for such contribution to the Fund. Additionally, a Withdrawing Partner may not withdraw any portion of his Capital Account during the period that begins 6 months after the Closing Date and ends 9 months after the Closing Date. Any withdrawal on such dates requires 45 days written notice to the General Partner. Thereafter, a Withdrawing Partner may make withdrawals as described in §6.1 above.

§6.3. Suspension of Withdrawal Right. The General Partner may, at any time, suspend the right of withdrawal, or postpone the payment of withdrawal proceeds, if and to the extent the withdrawal or payment would have a materially adverse effect on the Fund or the non-withdrawing Partners, for example because the liquidation of the Fund's positions would not be practical (due to the suspension of trading or

other reasons) or the General Partner cannot meaningfully value the Fund's portfolio (due to a lack of bids for Financial Instruments in the Fund's portfolio, or other reasons).

§6.4.    Effect of Complete Withdrawal.   A Limited Partner who elects or is required to make a complete withdrawal from his Capital Account shall continue as a Limited Partner after the date of his Withdrawal Notice until the effective date thereof (as provided in §6.1). However, he shall have no further right to exercise any power conferred herein or under the laws of any jurisdiction purporting by statute to grant express rights to a limited partner of a limited partnership. Nevertheless, all allocations of increases or decreases in the NAV of the Fund attributable to the Interest of the Withdrawing Partner, and any distributions made with respect thereto, shall be made to him through the effective date of his withdrawal (but he shall have no right to NAV increases or decreases occurring after the effective date of withdrawal, or to distributions declared after that date). The Interest shall not thereafter be included in calculating the Interests of the Partners necessary to take action hereunder. Upon Withdrawing Partner's receipt of the distributions required to be made in retirement of his Interest, he shall have no further rights hereunder. The withdrawal of a Limited Partner shall not dissolve the Fund and the remaining Partners shall continue the Fund pursuant hereto.

§6.5.    Distributions.   The General Partner may cause the Fund to make a distribution to the Partners of such amount as the General Partner may determine. Such distributions shall be made to the Partners according to their Fund Percentages for the Accounting Period in which the distributions are made.

§6.6.    Limitations; Form of Distributions.   No Partner shall be entitled to receive any distribution or make any withdrawal except as provided in this Article 6 or in §9.2. No Partner shall have the right to demand and receive property other than cash.

§6.7.    Withdrawals by the General Partner.   The General Partner may make withdrawals from its Capital Account at any time, without notice to the Limited Partners.

§6.8.    Required Withdrawal.   The General Partner may require a Limited Partner to withdraw from the Fund on 45 days' prior written notice to the Limited Partner (who shall be treated for all purposes as a Partner who has given a withdrawal notice under §6.1), if the General Partner reasonably determines that the withdrawal would be in the best interests of the Fund or the other Limited Partners.

## Article 7.    Management

§7.1.    Authority of the General Partner.   The management and operation of the Fund shall be vested exclusively in the General Partner, which shall have the authority and power on behalf and in the name of the Fund to perform all acts and enter into and perform all contracts and other undertakings which it may deem appropriate to the Fund's purposes. The General Partner may, with respect to all Limited Partners or specific Limited Partners, waive (a) any fee, allocation or other compensation payable to the General Partner hereunder, in whole or in part, and with respect to all Partners or specific Partners; and (b) any obligation, restriction or requirement imposed on Limited Partners hereunder.

§7.2.    Activities of General Partner and Affiliates; Interested Partners.

(a)    The General Partner or any Affiliate thereof shall not be required to devote its full time or any material proportion of its time to the Fund. However, the General Partner hereby agrees to use its best efforts in connection with the Fund's purposes and objectives and to devote thereto such of its time and activity during normal business days and hours as it may deem appropriate for the management of the Fund's affairs. However, nothing in this Section shall preclude the General Partner or any Affiliate thereof from: (i) acting, consistent with the foregoing, as a director, stockholder, officer, or employee of any corporation, a trustee of any trust, a partner of any other partnership, a member or manager of any limited liability company, or an administrative official of any other business or governmental entity, regardless of whether the Fund invests in or has dealings with the entity; (ii) receiving compensation for services rendered thereto, or participating in profits derived from investments in, any such entity; or (iii) from investing in any Financial Instruments, or other property for his account.

(b)    The fact that the General Partner, a Limited Partner, or an Affiliate thereof directly or indirectly owns an interest in, has any right to receive any payment with respect to, or is otherwise connected with any Person with which the Fund has dealings, including the right of any of them to receive the payment of advisory and management fees, brokerage fees, profit shares and other amounts, shall not preclude such dealings or make them void or voidable. Neither the Fund nor any Partner shall have any rights in or to such dealings or any payments or profits derived therefrom. Without limiting the foregoing, the General Partner or Affiliate thereof shall have the right to participate, directly or indirectly, in the fees payable by the Fund to investment advisers retained by the Fund, and may serve as an operator of or adviser to any entity in which the Fund may invest and receive a share of the profits of such entity or fees therefrom. Neither the General Partner nor any Affiliate thereof shall be obligated to present any particular investment opportunity to the Fund even if it is of a character which, if presented, could be taken by the Fund, and they shall have the right to take for their own account (individually, as trustee or general partner, or on behalf of any client) or to recommend to other individuals or entities any such particular investment opportunity. The General Partner and any Affiliate thereof may receive any "soft dollar" benefit in relation to the Fund, including benefits outside the "safe harbor" of Section 28(e) of the Securities Exchange Act of 1934.

(c)    Nothing herein shall prohibit any Partner or Affiliate thereof from buying or selling any Financial Instrument for his own account, including any Financial Instrument of the type held by the Fund.

§7.3.    Advisory and Consulting Services. The General Partner may enter into agreements with one or more Persons (including Affiliates of the General Partner) to serve as advisers or consultants to the Fund on a discretionary or non-discretionary basis and upon such other terms as the General Partner may determine.

§7.4.    Reliance by Third Parties. No Person shall be required to inquire into the authority of the General Partner to bind the Fund. Persons dealing with the Fund shall be entitled to rely on a certification by the General Partner as to the authority of any other person to act on the Fund's behalf in any matter.

§7.5.    Registration of Assets. Any assets owned by the Fund may be registered in the name of the Fund, a nominee, or a "street name." Any corporation, brokerage firm or transfer agent called upon to transfer any assets to or from the name of the Fund shall be entitled to rely upon instructions or assignments signed or purporting to be signed by the General Partner or its agents without inquiry as to the

authority of the person signing or purporting to sign or as to the validity of any transfer to or from the name of the Fund.

**Article 8.      Expenses.**

§8.1.    In General.    The Fund shall bear all the costs and expenses of its operation, including brokerage and other transaction costs; such management or similar fees as are specified in the Memorandum; interest; auditing, accounting, consulting and bookkeeping expenses; legal fees of both outside counsel and inside counsel; and filing and other regulatory fees.

§8.2.    Organizational and Offering Expenses.    The Fund shall reimburse the General Partner for all expenses borne by the General Partner or Affiliate thereof relating to the Fund's organization and the offering of its Interests.  However, if the Fund is dissolved before it fully reimburses the General Partner, the Fund shall have no obligation to further reimburse the General Partner.

§8.3.    Special Services.    A Limited Partner shall bear the cost of any special services he asks of the Fund (e.g., a special accounting to value an estate).

**Article 9.      Rights and Obligations of the Limited Partners**

§9.1.    In General.

(a)      No Limited Partner, as such, shall be personally liable for any debt, liability, contract or other obligation of the Fund.  He will be liable only to make the Capital Contribution specified in his Subscription Agreement.  He will not be required to lend any money to the Fund or, after his Capital Contribution is paid, make any further Capital Contribution to the Fund.  In accordance with the Act, a Limited Partner may under certain circumstances be required to return to the Fund, for the benefit of Fund creditors, amounts previously distributed to him as a return of capital.

(b)      The General Partner shall have no personal liability for the repayment of the Capital Contributions of any Limited Partner.

(c)      No Limited Partner may take part in the management or control of the business of the Fund, transact any business with or for the Fund, or have any authority to sign for or bind the Fund.

§9.2.    Assignments.

(a)      Except by gift, bequest or devise, no Limited Partner may assign his Interest or any part thereof except as the General Partner may consent.  Any assignee to whom the General Partner has consented shall become a substitute Limited Partner.  For purposes of this Section, a collateral assignment, such as a pledge, hypothecation or conditional transfer, shall not be deemed an assignment, but a completed transfer, whether voluntary or by operation of law, shall be considered an assignment.

(b)      If a Limited Partner assigns his entire Interest, he will upon the effective date of the assignment cease to be a Limited Partner for all purposes but will not be relieved of any obligations he may have had under this Agreement before the assignment date.

14

   (c)  Each Limited Partner consents to the admission of any Substitute Limited Partner consented to by the General Partner. Each Limited Partner shall, upon request of the General Partner, execute such certificates or other documents and perform such acts as the General Partner may require to preserve the status of the Fund as a limited partnership after the completion of any assignment of an Interest.

   (d)  Any purported assignment of an Interest of a Limited Partner in violation of this Agreement is void.

  §9.3. Death, Bankruptcy, or Incapacity of Limited Partner. If a Limited Partner or Assignee dies, is adjudged incompetent, or is subject to Bankruptcy, his duly appointed and qualified legal representative shall succeed to his Interest upon furnishing the General Partner satisfactory evidence of the representative's appointment and authority, subject to the General Partner's authority to require the representative to withdraw from the Fund.

## Article 10. Dissolution and Termination of the Fund

  §10.1. Dissolution. The Fund shall dissolve and wind up its affairs on the earliest to occur of: (a) the withdrawal of the General Partner where no successor General Partner is selected; (b) an event which makes it unlawful for the Fund business to be continued; or (c) any other event which, under the Act, requires the Fund's dissolution and the winding up of its business and affairs.

  §10.2. Liquidation and Distribution.

   (a)  Upon the dissolution of the Fund, the General Partner (or if the dissolution is caused by dissolution or Bankruptcy of the General Partner, the remaining general partners, if any, or a Person selected by a majority in Interest of the Limited Partners) shall act as liquidating trustee and shall wind up the Fund's affairs. The expenses of liquidation shall be paid by the Fund. Reserves may be created in the discretion of the liquidating trustee for paying contingencies. The expenses of liquidation shall include fair compensation for services rendered to the Fund by any person (including the General Partner), as well as a reasonable allocation of indirect overhead expenses of the General Partner or any non-Partner (including any Affiliate of the General Partner) who performs administrative services for the Fund (including salaries of accounting, secretarial, and clerical personnel, office rent, utilities, and other office expenses), to the extent such expenses are attributable to the liquidation.

   (b)  The Fund's net assets, after satisfaction of its liabilities and expenses (including liquidation expenses) to Persons who are not Partners shall be applied in the following manner and order: (i) payment and discharge on a pro rata basis of the claims of all creditors who are Partners (for the avoidance of doubt, such claims shall not include capital withdrawal amounts of Partners); and (ii) distribution of the remaining assets to the Partners in proportion to their Closing Capital Accounts for the Accounting Period in which termination takes place, without distinction between the General Partner and Limited Partners.

  §10.3. Termination. Each Partner shall be furnished a statement prepared by the Accountants, setting forth the Fund's assets and liabilities as of the date of dissolution. Upon compliance with the distribution plan above, the Limited Partners shall cease to be such, and the General Partner or the liquidation trustee shall execute, acknowledge, and cause to be filed a certification of cancellation of the Fund. Upon completion of the dissolution, winding up, liquidation and distribution of the liquidation proceeds, the Fund shall terminate.

**Article 11.    Withdrawal and Removal of General Partner**

§11.1    Withdrawal.  The General Partner may withdraw as the Fund's general partner on 30 days prior written notice to the Limited Partners.  Upon the occurrence of an Event of Withdrawal with respect to the General Partner, the Fund shall dissolve, unless within 30 days after the occurrence of any such event any remaining General Partner acting together with all the Limited Partners, elect to continue the Fund business and designate a successor General Partner.  If the Fund is so continued, the withdrawing General Partner: (i) shall be and remain liable for all obligations and liabilities incurred by it as a General Partner during its membership in the Fund; (ii) shall be free of any obligations or liability incurred on account of the activities of the Fund from and after the time it ceased to be a General Partner; and (iii) shall be entitled to receive (A) any expense reimbursement, or other amounts due and owing to it at the date of withdrawal plus (B) its Closing Capital Account as of the close of the Accounting Period in which the withdrawal is effective.

§11.2.    Removal.  The Limited Partners shall have the authority to remove the General Partner upon the vote of 70% in Interest of the Limited Partners.

**Article 12.    Exculpation and Indemnification**

§12.1    Exculpation.  The General Partner and its Affiliates shall not be liable to the Fund or any other Partner for any claims, costs, expenses, damages or losses arising out of the performance of the General Partner's duties under this Agreement other than those directly attributable to the General Partner's or Affiliates own fraud, gross negligence or intentional misconduct, as determined by a judicial, non-appealable order.  The General Partner and any Affiliate or employee of the General Partner shall be entitled to rely on the advice of Legal Counsel, the Accountants, or other independent experts experienced in the matter at issue.  Any act or omission of any General Partner, Affiliate, or employee pursuant to such advice shall in no event subject the Person to liability to the Fund or any Limited Partner.  However, if the General Partner or Affiliate thereof is registered as an investment adviser no exculpation shall be permitted hereunder for any violation of federal or state securities law.

§12.2.    Indemnification.  To the maximum extent permitted by law, the Fund shall indemnify any Person, including the General Partner or any Affiliate, employee, or stockholder of the General Partner, who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including any action by or in the right of the Fund) by reason of any acts, omissions or alleged acts or omissions by such Person on behalf of the Fund, against expenses for which such Person has not otherwise been reimbursed (including attorneys' fees, judgments, fines and amounts paid in settlement) actually and reasonably incurred in connection with such action, suit or proceeding, unless such act or omission is determined by judicial, non-appealable order to be the result of fraud, intentional misconduct or gross negligence or, with respect to any criminal action or proceeding, unless such Person had reasonable cause to believe his conduct was unlawful.  The satisfaction of any indemnification shall be from and limited to Fund assets.  The General Partner may cause the Fund to advance to the General Partner or such Affiliate reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action or proceeding arising from such conduct.  The General Partner agrees, and each other indemnified person shall agree, that if an advance is made, it will be repaid if a court or governmental agency of competent jurisdiction determines in a non-appealable order that the indemnified person was not entitled to indemnification under this Section.

**Article 13.    Miscellaneous**

§13.1.  Appointment of General Partner as Attorney-in-Fact.

(a)  By executing this Agreement, each Partner irrevocably appoints the General Partner its true and lawful attorney-in-fact with full power and authority in its name to execute, acknowledge, deliver, file and record such documents as may be necessary or appropriate to carry out this Agreement. Thus, appointment shall be deemed a power coupled with an interest and shall survive the bankruptcy, death, adjudication of incompetence or insanity, or dissolution of any Partner.

§13.2.  Signatures; Amendments.

(a)  Each Partner shall become a party hereto by signing such number of counterpart signature pages to this Agreement or such other instrument or instruments, and in such manner, as the General Partner may determine. However, no such counterpart or instrument shall be binding until it is accepted by the General Partner. Each party agrees to execute or cause to be executed all such documents, and to do or cause to be done all such filings and other acts as the General Partner may require, to comply with the applicable laws of any jurisdiction in which the Fund conducts business.

(b)  This Agreement may be amended from time to time by the General Partner, without the consent of any Limited Partner, to make any change that is not materially adverse to the interests of any Limited Partner (unless he consents thereto), or does not adversely affect the limited liability of the Limited Partners or the status of the Fund as a partnership for federal income tax purposes.

(c)  In addition to the amendments otherwise authorized herein, amendments may be made hereto from time to time by the General Partner with the consent of the holders of a majority in Interest of the Limited Partners. Such consent may be obtained pursuant to a negative consent procedure affording the Limited Partners 30 days to object. However, without the consent of the Partners to be adversely affected by the amendment, this Agreement may not be amended under this subsection (c) so as to: (i) convert a Limited Partner's Interest into a General Partner's Interest; (ii) modify the limited liability of a Limited Partner; or (iii) alter the Interest of a Partner in the NAV of or distributions from the Fund.

§13.3.  Notices and Addresses. All notices required to be given under this Agreement shall be in writing and shall be mailed by certified or registered mail, hand delivered, or delivered by next business day courier. Any notice to be sent to the Fund shall be mailed to the principal place of business of the Fund or to such other address as the General Partner may specify in a notice sent to all Partners. All notices to Partners shall be mailed or delivered to them at the addresses specified by the Partner in a written notice to the Fund (which initially shall be the address set forth in the Partner's Subscription Agreement). Notices shall be effective on the date three days after the date of mailing as evidenced by the U.S. Post Office mark or, if hand delivered by next day business courier, on the date of delivery. However, notices to the General Partner shall be effective upon receipt.

§13.4.  Governing Law. This Agreement is governed by and to be construed in accordance with the internal law of Delaware.

§13.5.  Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Partners, indemnitees hereunder, and their respective legal representatives, successors and permitted assigns.

§13.6.  Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one instrument.

§13.7.  _Modifications To Be In Writing_.  This Agreement constitutes the entire understanding of the parties hereto. No amendment, modification or alternation will be binding unless the same be in writing and adopted in accordance with this Article.

§13.8.  _Interpretation_.  The use of the neuter herein shall be deemed to include the feminine and masculine genders.  The use of either the singular or the plural includes the other unless the context clearly requires otherwise.  The captions are inserted for convenience of reference only and shall not affect the construction of this Agreement.

§13.9.  _Validity And Severability_.  If any provision herein is held invalid or unenforceable, such decision shall not affect the validity or enforceability of any other provision hereof, all of which other provisions shall remain in full force and effect.

§13.10.  _Statutory References_.  Each reference herein to a particular statute or regulation, or a provision thereof, shall be deemed to refer to such statute, regulation, or provision, or to any similar or superseding statute, regulation, or provision as is from time to time in effect.

§13.11.  _Partition Action_.  Each party hereto irrevocably waives any right which it may have to maintain an action for partition with respect to property of the Fund.

IN WITNESS WHEREOF, the undersigned have executed this Agreement of Limited Partnership as of the date first above written.

**GENERAL PARTNER:**

_____

By: _____
Name: _____
Title: President

**LIMITED PARTNERS:**

By: _____
As Attorney-in-Fact

By: _____
Name: _____
Title: _____

CH01/12112276.1

Ex. #3



Theodore and Sarah Gradel
2512 Winter Park CT
Naperville, IL 60565
July 7, 2004

Pam Patterson
Longboat Global funds Management, LLC
2 N. Tamiami Trail, Suite 1200
Sarasota, FL 34236-5560

Dear Pam:

With this letter, I wish to redeem all shares in full, in The Piranha Fund as of July 7, 2004.

Sincerely,

Theodore and Sarah Gradel

Thomas Mazza
25 W 487 Plamondon RD
Wheaton, IL 60187
July 7, 2004

Pam Patterson
Longboat Global funds Management, LLC
2 N. Tamiami Trail, Suite 1200
Sarasota, FL 34236-5560

Dear Pam:

With this letter, I wish to redeem all shares in full, in The Piranha Fund as of July 7, 2004.

Sincerely,

Thomas G. Mazza

Thomas Mazza

James Maude
300 Donlea RD
Barrington Hills, IL 60010
July 7, 2004

Pam Patterson
Longboat Global funds Management, LLC
2 N. Tamiami Trail, Suite 1200
Sarasota, FL 34236-5560

Dear Pam:

With this letter, I wish to redeem all shares in full, in The Piranha Fund as of July 7, 2004.

Sincerely,

James X Maude

James Maude

Ex. #4

# Abaco Financial Services Corporation

## Accountant's Compilation Report

To the Partners
Piranha Capital, L.P.
2 N. Tamiami Trail, Suite 1200
Sarasota, FL 34236

We have compiled the accompanying statement of financial condition for Piranha Capital, L.P. as of August 31, 2004, and the related statements of operations and changes in partners' capital for the month then ended, in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants.

A compilation is limited to presenting in the form of financial statements information that is the representation of management. We have not audited or reviewed the accompanying financial statements and, accordingly, do not express an opinion or any other form of assurance on them.

Management has elected to omit substantially all of the informative disclosures ordinarily included in financial statements. If the omitted disclosures were included in the financial statements, they might influence the user's conclusions about the partnership's assets, liabilities, net asset value, revenue, and expenses. Accordingly, these financial statements are not designed for those who are not informed about such matters

September 10, 2004
Sarasota, Florida

_____

David J. Barton
Senior Partner



No Bear. No Bull. No Limits.

September 10, 2004

Mr. Thomas A. Mazza
25 W. 487 Plantation Rd.
Wheaton, IL 60187

Enclosed you will find your August 31, 2004 financial statement for the
Piranha Capital, LP. Our accounting firm, Abaco Financial Services
Corporation, Boynton Beach, FL compiles our financial statements.

## STATEMENT OF CHANGES IN NET ASSET VALUE

| | Limited Partners | General Partner | Deferred Incentive Allocation – G.P. | Total Fund |
|---|---|---|---|---|
| Beginning Net Asset Value | $ 32,772,395.69 | $ 0.00 | $ 0.00 | $ 32,772,395.69 |
| Contributions | 0.00 | 0.00 | 0.00 | 0.00 |
| Redemptions | (2,769,724.98) | 0.00 | 0.00 | (2,769,724.98) |
| Net Income (loss) | 148,656.74 | 0.00 | 0.00 | 148,656.74 |
| G.P.'s Incentive Allocation | (478.91) | 0.00 | 478.91 | 0.00 |
| Ending Net Asset Value | $ 30,150,848.54 | $ 0.00 | $ 478.91 | $ 30,151,327.45 |

Joseph Beasley – General Partner
Piranha Capital, LP
Longboat Global Funds Management, LLC

2 N. Tamiami Trail, Ste. 1200, Sarasota, FL 34236
Phone: 941-361-2101 / Fax: 941-361-2111 / Toll: 941-747-7711

Ex. #5

PIRANHA CAPITAL, L.P.
STATEMENT OF OPERATIONS
FOR THE PERIOD ENDED AUGUST 31, 2004
(Prepared From Books Without Audit)

Individual Account Statement

Theodore F. & Sarah J. Gradel
2512 Winter Park Ct.
Naperville, IL 60565

| | Current Period | Year to Date 2004 |
|---|---|---|
| **REALIZED AND UNREALIZED GAIN (LOSS) ON FUTURES** | | |
| Realized gain (loss) from closed positions | $ (1,061.64) | $ (3,624.79) |
| Change in unrealized gain (loss) on open positions | 30.35 | (857.59) |
| Net trading profit (loss) | (1,031.30) | (4,482.38) |
| **REALIZED AND UNREALIZED GAIN (LOSS) ON SECURITIES** | | |
| Net realized gain (losses) from closed positions | (210.56) | (4,292.78) |
| Change in unrealized gains (losses) on open positions. | 211.32 | (11,903.40) |
| Net trading profit (loss) | 0.76 | (16,196.17) |
| **INTEREST & DIVIDEND INCOME** | | |
| Interest income | 2,487.81 | 17,985.23 |
| Dividend income | 370.03 | 1,284.85 |
| Total interest & dividend income | 2,857.84 | 19,270.08 |
| **EXPENSES** | | |
| Interest expense | 0.15 | 147.38 |
| Dividends expense | 25.13 | 58.89 |
| Management Fee | 491.61 | 3,953.64 |
| Operating/other expenses | 11.42 | 103.56 |
| Total expenses | 528.32 | 4,263.47 |
| Net income (loss) before General Partner's incentive allocation | 1,298.99 | (5,671.94) |
| **GENERAL PARTNER'S INCENTIVE ALLOCATION** | 0.00 | (747.86) |
| Net income (loss) after General Partner's incentive allocation | $ 1,298.99 | $ (6,419.80) |

STATEMENT OF CHANGES IN NET ASSET VALUE

| | Current Period | Year to Date 2004 |
|---|---|---|
| Beginning Net Asset Value | $ 293,174.71 | $ 300,893.50 |
| Contributions | 0.00 | 0.00 |
| Net Income (loss) | 1,298.99 | (5,671.94) |
| Redemptions | (294,473.70) | (294,473.70) |
| Organizational & offering cost adjustment | 0.00 | 0.00 |
| Prior Period Adjustment | 0.00 | 0.00 |
| General Partner's incentive allocation | 0.00 | (747.86) |
| Ending Net Asset Value | $ (0.00) | $ (0.00) |
| Limited Partner's monthly rate of return | | 0.44% |
| Limited Partner's Y-T-D rate of return | | -2.13% |

See Accountant's Compilation Report

**PIRANHA CAPITAL, L.P.**
**STATEMENT OF OPERATIONS**
**FOR THE PERIOD ENDED AUGUST 31, 2004**
(Prepared From Books Without Audit)

Individual Account Statement

Thomas A. Mazza
25 W. 487 Plantation Rd.
Wheaton, IL 60187

| | Current Period | | Year to Date 2004 |
|---|---:|---|---:|
| **REALIZED AND UNREALIZED GAIN (LOSS) ON FUTURES** | | | |
| Realized gain (loss) from closed positions | $ (2,041.22) | $ | (6,969.36) |
| Change in unrealized gain (loss) on open positions | 58.35 | | (1,648.89) |
| Net trading profit (loss) | (1,982.87) | | (8,618.25) |
| **REALIZED AND UNREALIZED GAIN (LOSS) ON SECURITIES** | | | |
| Net realized gain (losses) from closed positions | (404.85) | | (8,253.71) |
| Change in unrealized gains (losses) on open positions | 406.31 | | (22,886.63) |
| Net trading profit (loss) | 1.46 | | (31,140.34) |
| **INTEREST & DIVIDEND INCOME** | | | |
| Interest income | 4,783.31 | | 34,580.17 |
| Dividend income | 711.45 | | 2,470.38 |
| Total interest & dividend income | 5,494.76 | | 37,050.55 |
| **EXPENSES** | | | |
| Interest expense | 0.29 | | 283.34 |
| Dividends expense | 48.32 | | 113.22 |
| Management Fee | 945.22 | | 7,601.66 |
| Operating/other expenses | 21.96 | | 199.15 |
| Total expenses | 1,015.79 | | 8,197.37 |
| Net Income (loss) before General Partner's Incentive allocation | 2,497.56 | | (10,905.42) |
| **GENERAL PARTNER'S INCENTIVE ALLOCATION** | 0.00 | | (1,437.91) |
| Net income (loss) after General Partner's incentive allocation | $ 2,497.56 | $ | (12,343.34) |

**STATEMENT OF CHANGES IN NET ASSET VALUE**

| | Current Period | | Year to Date 2004 |
|---|---:|---|---:|
| Beginning Net Asset Value | $ 563,686.36 | $ | 578,527.25 |
| Contributions | 0.00 | | 0.00 |
| Net income (loss) | 2,497.56 | | (10,905.42) |
| Redemptions | (566,183.91) | | (566,183.91) |
| Organizational & offering cost adjustment | 0.00 | | 0.00 |
| Prior Period Adjustment | 0.00 | | 0.00 |
| General Partner's incentive allocation | 0.00 | | (1,437.91) |
| Ending Net Asset Value | $ 0.00 | $ | 0.00 |
| Limited Partner's monthly rate of return | | | 0.44% |
| Limited Partner's Y-T-D rate of return | | | -2.13% |

See Accountant's Compilation Report

**PIRANHA CAPITAL, L.P.**
**STATEMENT OF OPERATIONS**
**FOR THE PERIOD ENDED AUGUST 31, 2004**
(Prepared From Books Without Audit)

Individual Account Statement

James X. Maude
300 Donlea Road
Barrington Hills, IL 60010

| | Current Period | Year to Date 2004 |
|---|---|---|
| **REALIZED AND UNREALIZED GAIN (LOSS) ON FUTURES** | | |
| Realized gain (loss) from closed positions | $ (2,041.22) | $ (6,969.36) |
| Change in unrealized gain (loss) on open positions | 58.35 | (1,648.89) |
| Net trading profit (loss) | (1,982.87) | (8,618.25) |
| **REALIZED AND UNREALIZED GAIN (LOSS) ON SECURITIES** | | |
| Net realized gain (losses) from closed positions | (404.85) | (8,253.71) |
| Change in unrealized gains (losses) on open positions | 406.31 | (22,886.63) |
| Net trading profit (loss) | 1.46 | (31,140.34) |
| **INTEREST & DIVIDEND INCOME** | | |
| Interest income | 4,783.31 | 34,580.17 |
| Dividend income | 711.46 | 2,470.38 |
| Total interest & dividend income | 5,494.76 | 37,050.55 |
| **EXPENSES** | | |
| Interest expense | 0.29 | 283.34 |
| Dividends expense | 48.32 | 113.22 |
| Management Fee | 945.22 | 7,601.66 |
| Operating/other expenses | 21.96 | 199.15 |
| Total expenses | 1,015.79 | 8,197.37 |
| Net income (loss) before General Partner's incentive allocation | 2,497.56 | (10,905.42) |
| **GENERAL PARTNER'S INCENTIVE ALLOCATION** | 0.00 | (1,437.91) |
| Net income (loss) after General Partner's incentive allocation | $ 2,497.56 | $ (12,343.34) |

**STATEMENT OF CHANGES IN NET ASSET VALUE**

| | Current Period | Year to Date 2004 |
|---|---|---|
| Beginning Net Asset Value | $ 563,686.36 | $ 578,527.25 |
| Contributions | 0.00 | 0.00 |
| Net income (loss) | 2,497.56 | (10,905.42) |
| Redemptions | (566,183.91) | (566,183.91) |
| Organizational & offering cost adjustment | 0.00 | 0.00 |
| Prior Period Adjustment | 0.00 | 0.00 |
| General Partner's incentive allocation | 0.00 | (1,437.91) |
| Ending Net Asset Value | $ 0.00 | $ 0.00 |
| Limited Partner's monthly rate of return | | 0.44% |
| Limited Partner's Y-T-D rate of return | | -2.13% |

See Accountant's Compilation Report

Ex. #6

**Longboat Global Funds Management, LLC**
2 N. Tamiami Trail, Ste. 1200, Sarasota, FL 34236
Phone: 941-361-2184 / Fax: 941-361-2186

September 24, 2004

By Federal Express

Dear Investors in Piranha Capital L.P.

As part of a routine audit of Longboat Global Funds Management, LLC, the National Futures Association (NFA) expressed to Longboat their significant concerns in relation to various real estate linked notes held by the Fund.

NFA's concerns were in the areas of full disclosure to Fund investors, the percentage of the Fund's assets in the form of the notes, that the notes were repeatedly extended without any payments of interest or principal, that the Fund's security interests either were not perfected or there were questions whether any valid security interests were created, that certain of the notes were issued by entities controlled by Joe Beasley, the principal of Longboat, and, most importantly, as to the Fund's non-discounted valuation of the notes.

Longboat fully cooperated in NFA's audit and provided substantial documentation in those areas of concerns. However, on September 20, 2004, NFA instituted a member responsibility action against Longboat and Joe Beasley. Essentially, NFA's action restricts Longboat from (a) soliciting or accepting new capital to the Fund, (b) disbursing monies from the Fund, other than for meeting redemption demands, without prior approval from NFA, or (c) making any loans or investing in any notes or other debt instruments or real estate investment without prior approval from NFA.

Regrettably, in light of recent developments, Longboat believes that a substantial number of investors in the Fund will redeem, which redemptions likely would exceed the liquid assets of the Fund. In order to be fair to all Fund investors, including the non-redeeming investors, Longboat has determined that it is appropriate, and hereby elects effective immediately, under Section 6.3 of the Amended and Restated Agreement of Limited Partnership of the Fund, to suspend the right of withdrawal and postpone the payment of withdrawal proceeds to investors.

Longboat also has determined that it will return, by the end of next week, approximately 75% of the Fund's liquid assets to investors. Such return of capital will be done proportionately, so that every investor will receive in cash the same percentage of its capital account.

Longboat continues to believe that the real estate linked notes held by the Fund will be paid. Longboat intends to lift the redemption suspension at such time as those notes are substantially all paid.

We appreciate your patience during this interim period.

Very truly yours,

LONGBOAT GLOBAL FUNDS MANAGEMENT, LLC

By: _____
Joseph Beasley, President

Ex. #7

*PIRANHA CAPITAL, L.P.*

*Annual Report*

*December 31, 2003 and 2002*

# PIRANHA CAPITAL, L.P.

## INDEX TO FINANCIAL STATEMENTS

| | Page (s) |
|---|---|
| Independent Auditor's Report | 1 |
| Financial Statements: | |
| Statement of Financial Condition | 2 |
| Statement of Operations | 3 |
| Statement of Changes in Partners' Capital (Net Asset Value) | 4 |
| Notes to Financial Statements | 5-9 |
| Affirmation of the General Partner | 10 |

# Chawla Group, CPAs

2182-D Gladstone Ct., Glendale Heights, IL 60139
(630) 622-0045 Fax: (630) 622-0048

To the Partners
Piranha Capital, L.P.

## INDEPENDENT AUDITOR'S REPORT

We have audited the accompanying statement of financial condition of Piranha Capital, L.P. for the years ended December 31, 2003 and 2002, and the related statement of operations and changes in partners' capital (net asset value) for the year then ended. These financial statements are the responsibility of the Partnership's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Piranha Capital, L.P. as of December 31, 2003 and 2002 the results of its operations and the changes in its partners' capital for the year then ended in conformity with generally accepted accounting principles.

*Jc Chawla*

Jasdeep Chawla, C.P.A.
Glendale Heights, Illinois
March 22, 2004

1

# PIRANHA CAPITAL, L.P.
## STATEMENT OF FINANCIAL CONDITION
### YEARS ENDED DECEMBER 31, 2003 and 2002

## ASSETS

| | | 2003 | | 2002 |
|---|---|---:|---|---:|
| **Current Assets:** | | | | |
| Cash and cash equivalents | $ | 1,132 | $ | 276,243 |
| Equity at broker | | 14,469,798 | | 6,573,280 |
| Interest receivable | | 0 | | 2,670 |
| Total Current Assets | | 14,470,930 | | 6,852,193 |
| **Other Assets:** | | | | |
| Promissory notes receivable (Note 5) | | 12,565,050 | | 12,565,050 |
| Accrued interest on promissory notes | | 5,978,374 | | 2,330,732 |
| Other receivables | | 0 | | 250,090 |
| Total Other Assets | | 18,543,424 | | 15,145,872 |
| Total Assets | $ | 33,014,354 | $ | 21,998,065 |

## LIABILITIES

| | | 2003 | | 2002 |
|---|---|---:|---|---:|
| Partner redemptions payable | | 400,584 | | 100,310 |
| Management fee payable | | 49,534 | | 31,367 |
| Accrued administrative fees | | 15,400 | | 10,000 |
| Pending partner additions | | 1,144,000 | | 0 |
| Total Liabilities | $ | 1,609,517 | $ | 141,677 |

## PARTNER'S CAPITAL

| | | 2003 | | 2002 |
|---|---|---:|---|---:|
| Limited Partners | | 31,404,836 | | 21,856,388 |
| Total Partner's Capital | | 31,404,836 | | 21,856,388 |
| **TOTAL LIABILITIES AND PARTNER'S CAPITAL** | $ | 33,014,354 | $ | 21,998,065 |

See notes to financial statements.



**PIRANHA CAPITAL, L.P.**
STATEMENT OF OPERATIONS
YEARS ENDED DECEMBER 31, 2003 and 2002

| INCOME | | 2003 | | 2002 |
|---|---|---|---|---|
| Gross realized - futures | $ | 1,005,625 | $ | (19,935) |
| Change in unrealized gain (loss) on open positions | | 6,098 | | 121,425 |
| Commissions and fees | | (286,845) | | (30,661) |
| Total Income - Futures | | 724,878 | | 70,829 |
| Net realized - securities | | 464,466 | | (634,275) |
| Change in unrealized gain (loss) on open positions | | 1,439,277 | | 25,232 |
| Total Income - Securities | | 1,903,742 | | (609,043) |
| Interest on promissory notes receivable | | 3,647,642 | | 1,791,314 |
| Interest and dividend income - banks and brokers | | 179,083 | | 153,100 |
| Total Interest and Dividend Income | | 3,826,724 | | 1,944,414 |
| Total Income | | 6,455,345 | | 1,406,200 |
| **EXPENSES** | | | | |
| Management fee | | 500,476 | | 285,221 |
| Operating expense | | 35,438 | | 52,634 |
| Dividend expense | | 2,635 | | 3,247 |
| Interest expense | | 25,011 | | 0 |
| Total Expense | | 563,559 | | 341,103 |
| Net Income Before Incentive Allocation | | 5,891,785 | | 1,065,098 |
| General Partner Incentive Allocation | | (1,163,027) | | (197,541) |
| **NET INCOME** | $ | 4,728,758 | $ | 867,556 |

See notes to financial statements.

3

**STATEMENT OF CHANGES IN PARTNER'S CAPITAL (NET ASSET VALUE)**
YEARS ENDED DECEMBER 31, 2003 & 2002

| | | Limited Partners | General Partner | Total Partners Capital |
|---|---|---|---|---|
| Balance on January 1, 2002 | $ | 7,190,573 | $      0 | $   7,190,573 |
| Additions | | 15,254,632 | 9,894 | 15,264,526 |
| Net Income (loss) before G.P. incentive allocation | | 1,064,316 | 782 | 1,065,098 |
| Withdrawals | | (1,453,033) | (210,776) | (1,663,809) |
| Prior Period adjustment | | (2,559) | 2,559 | 0 |
| Incentive allocation to General Partner | | (197,541) | 197,541 | 0 |
| Balance at December 31, 2002 | $ | 21,856,388 | $      0 | $  21,856,388 |
| Additions | | 7,102,155 | 9,894 | 7,112,050 |
| Net Income (loss) before G.P. incentive allocation | | 5,875,082 | 16,703 | 5,891,785 |
| Withdrawals | | (2,265,762) | (1,189,624) | (3,455,386) |
| Prior Period adjustment | | 0 | 0 | 0 |
| Incentive allocation to General Partner | | (1,163,027) | 1,163,027 | 0 |
| Balance at December 31, 2003 | $ | 31,404,836 | $      0 | $  31,404,836 |

**LIMITED PARTNER INVESTMENT ACCOUNTS AS OF DECEMBER 31, 2003:**

| Investor | Amount | Investor | Amount | Investor | Amount |
|---|---|---|---|---|---|
| INVESTOR #1 | 668,019 | INVESTOR #23 | 76,221 | INVESTOR #45 | 504,828 |
| INVESTOR #2 | 454,734 | INVESTOR #24 | 163,299 | INVESTOR #46 | 47,768 |
| INVESTOR #3 | 406,664 | INVESTOR #25 | 357,280 | INVESTOR #47 | 298,841 |
| INVESTOR #4 | 133,445 | INVESTOR #26 | 197,972 | INVESTOR #48 | 2,413,568 |
| INVESTOR #5 | 400,515 | INVESTOR #27 | 319,152 | INVESTOR #49 | 353,520 |
| INVESTOR #6 | 196,027 | INVESTOR #28 | 188,551 | INVESTOR #50 | 462,057 |
| INVESTOR #7 | 340,741 | INVESTOR #29 | 52,398 | INVESTOR #51 | 120,621 |
| INVESTOR #8 | 326,237 | INVESTOR #30 | 312,911 | INVESTOR #52 | 5,185 |
| INVESTOR #9 | 324,919 | INVESTOR #31 | 165,945 | INVESTOR #53 | 301,797 |
| INVESTOR #10 | 197,132 | INVESTOR #32 | 1,091,714 | INVESTOR #54 | 230,178 |
| INVESTOR #11 | 453,052 | INVESTOR #33 | 307,323 | INVESTOR #55 | 298,510 |
| INVESTOR #12 | 129,785 | INVESTOR #34 | 307,448 | INVESTOR #56 | 293,643 |
| INVESTOR #13 | 182,181 | INVESTOR #35 | 48,350 | INVESTOR #57 | 241,760 |
| INVESTOR #14 | 32,427 | INVESTOR #36 | 486,578 | INVESTOR #58 | 224,709 |
| INVESTOR #15 | 1,229,738 | INVESTOR #37 | 678,984 | INVESTOR #59 | 579,637 |
| INVESTOR #16 | 133,044 | INVESTOR #38 | 202,614 | INVESTOR #60 | 327,602 |
| INVESTOR #17 | 17,785 | INVESTOR #39 | 578,527 | INVESTOR #61 | 682,193 |
| INVESTOR #18 | 395,816 | INVESTOR #40 | 578,527 | INVESTOR #62 | 2,569,843 |
| INVESTOR #19 | 273,103 | INVESTOR #41 | 300,894 | INVESTOR #63 | 277,634 |
| INVESTOR #20 | 429,401 | INVESTOR #42 | 6,017,776 | INVESTOR #64 | 263,195 |
| INVESTOR #21 | 25,310 | INVESTOR #43 | 576,302 | INVESTOR #65 | 105,278 |
| INVESTOR #22 | 76,221 | INVESTOR #44 | 967,412 | | |
| | | | | **TOTAL** | 31,404,836 |

See notes to financial statements.

4

# PIRANHA CAPITAL, L.P.

## (a Delaware Limited Partnership)

## NOTES TO FINANCIAL STATEMENTS

### December 31, 2003

**Note 1.**     **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

### A.    General Description of Fund

Piranha Capital, L.P. (the Fund) is a Delaware limited partnership which operates as an investment pool. The Fund was formed to invest and trade in contracts to buy and sell commodity and securities interests and other financial instruments. The Fund accepted its first limited partner investment in February 2001 and made its first investment in March 2001.

### B.    Method of Reporting

The Fund's financial statements are presented in accordance with generally accepted accounting principles. Gains or losses are realized when contracts are liquidated. Unrealized gains or losses on open contracts (the difference between contract purchase price and market price) at the date of the statement of financial condition are stated on the statement of financial condition. Any change in net unrealized gain or loss from the preceding period is reported in the statement of operations.

### C.    Brokerage Commissions

Pursuant to agreements with the Clearing Broker, the fund pays commodity brokerage commissions equal to $26.64 per round turn for trades executed on U.S. exchanges which includes all applicable exchange, floor brokerage, clearing and give up fees, and also includes NFA fees. NFA and exchange fees were $10,767 for the year 2003. For equities, the Fund paid $.03 per share, $2.00 per option contract with a minimum charge of $25 per transaction.

### D.    Income Taxes

The Fund prepares calendar year U.S. and state information tax returns and reports to the partners their allocable shares of the Fund's income, expenses and trading gains or losses.

### E. Incentive Allocation and Management Fees

The fund pays the General Partner a monthly management fee at the annual rate of 2% of the net asset value of the fund. In addition, the Fund also allocates to General Partner (Incentive allocation) 20% of the profits of the fund, in excess of those profits allocated to restore previously allocated losses. The General Partner serves as the fund's trading advisor. Management fees for the year 2003 were $500,476 and the incentive allocation was $1,163,027.

### F. Organizational & Offering Expense

As per the private placement memorandum, the General Partner is to be reimbursed over 24 months from the fund. The General Partner's capital account was allocated $824 per month. The amount was deducted from the limited partner's capital accounts and allocated to the General Partner. No Organization and Offering Expense appears for the current year because the entire amount was expensed in 2001.

### Note 2. DEPOSITS WITH BROKER

The Fund deposits funds with LFG division of Refco, DLJ Securities Corporation, Banc of America Securities and Fidelity Investments to act as brokers. Margin requirements are satisfied by the deposit of cash with such brokers.

A customer's cash and other property deposited with a broker (for example, U.S. Treasury bills) are considered co-mingled with all other funds subject to the broker's segregation requirements. In the event of a broker's insolvency, recovery may be limited to a pro-rata share of segregated funds available. It is possible that the recovered amount could be less than total cash and other property deposited.

### Note 3. GENERAL PARTNER

The General Partner of the Fund, Longboat Global Funds Management, LLC is a Florida limited liability company. Mr. Joseph Beasley, who is President and sole principal of the General Partner, executes the General Partner's investment strategy for the Fund. The General Partner administers the Fund's operations and also serves as the Trading Advisor to the fund.

### Note 4. FAIR VALUE AND OFF-BALANCE SHEET RISK

The Fund invests and trades in contracts to buy or sell commodity and security interests (including futures, options and forward contracts and other securities) and other financial instruments. Purchase and sale of such contracts requires a deposit of money (margin) in a segregated account at the broker. Additional deposits are necessary for any loss on contract value. The Fund is able to acquire (or sell) contracts

6

by depositing only a small portion of the total contract value. The ability to control large dollar amounts of contracts with a comparatively small amount of capital (leverage) results in a minor price change causing a major gain or loss on contract value. Theoretically, the Fund is exposed to a market risk (loss) equal to the value of contracts purchased and unlimited liability on contracts sold short. Open contracts at December 31, 2003 are marked-to-market and included in the statement of financial condition, and the change in value is reported in the statement of operations.

The Fund trades in various financial instruments. The Fund's principal source of revenues by reporting category are as follows:

| Futures Realized Trading Gains/(losses) | Futures Unrealized Trading Gains/(Losses) | Securities Realized Trading Gains/(losses) | Securities Unrealized Trading Gains/(Losses) | Interest on Promissory Notes & Other |
|---|---|---|---|---|
| $718,780 | $6,098 | $464,466 | $1,439,277 | $3,697,434 |

The Fund was organized to engage in trading of a diversified portfolio of futures, securities and other financial instruments. SFAS 119, "Disclosure about Derivative Financial instruments and Fair Value of Financial Instruments", defines a derivative as a future, forward, swap or option contract, or other financial instrument with similar characteristics such as caps, floors and collars. Generally, these financial instruments represent future commitments to exchange interest payment streams or currencies or to purchase or to sell other financial instruments at specific terms at specified future dates. Option contracts provide the holder with the right, but not the obligation, to purchase or sell a financial instrument at a specific price before or on an established date. These financial instruments may have market and/or credit risk in excess of amounts recorded in the Statement of Financial Condition.

Market Risk — Financial instruments involve varying degrees of off-balance sheet market risk whereby changes in the level or volatility of interest rates, foreign currency exchange rates or market values of the underlying financial instruments or commodities may result in changes in the value of the financial instrument in excess of the amounts currently reflected in the Statement of Financial Condition. The Fund's exposure to market risk is influenced by a number of factors, including the relationships among financial instruments with off-balance sheet risk and the Fund's proprietary trading as well as the volatility and liquidity in the markets in which the financial instruments are traded.

7



Fair Value – The instruments used in the Fund's trading activities are marked to market daily with the resulting unrealized gains or losses recorded in the Statement of Financial Conditions and the related income or loss reflected in revenues derived from these transactions. The fair value of financial instruments held or issued for trading purposes as of December 31, 2003 are as follows:

|  | Fair Value Year-end | | Fair Value Average | |
|---|---|---|---|---|
|  | Assets | Liabilities | Assets | Liabilities |
| Futures | $590,834 | $448,283 | $333,994 | $483,470 |
| Securities | $1,373,793 | $14,268 | $497,923 | $30,819 |

**Note 5.** **PROMISSORY NOTES RECEIVABLE**

As of December 31, 2003 the Fund had entered into the following loan agreements:

|  | Date Loan Started | Principal Amount Of Loan | Effective Interest (Per annum) + penalties | 2003 Accrued Interest |
|---|---|---|---|---|
| 1. | Mar. 01-Aug. 02 | $ 3,875,000 | 10%-12% | $ 427,500 |
| 2. | Mar. 01- Oct. 02 | $ 4,174,000 | 27%-30% | $ 1,552,005 |
| 3. | Aug. 02-Sep. 02 | $ 1,600,000 | 20%-25% | $ 704,982 |
| 4. | May 02-Jul. 02 | $ 2,125,000 | 30% | $ 746,383 |
| 5. | Mar.01-Aug. 02 | $ 390,000 | 17% | $ 66,300 |
| 6. | Mar. 01-Apr.01 | $ 401,050 | 25% | $ 150,472 |
|  | TOTAL | $12,565,050 |  | $ 3,647,642 |

The above Promissory Notes were between the Fund and five different LLCs and two corporations. The above summary represents a total of 45 separate promissory notes entered into at different dates during the year. The column titled "Date Loan Started" indicates the time period within which the promissory notes were entered into in the year 2001 and 2002. Promissory notes summarized above are secured by the security interest in various properties both in the U.S. and overseas and by the assets of the borrower.



**Note 6.**   **SCHEDULE OF INVESTMENTS**

As of December 31, 2003 the Fund had the following investments.

| | |
|---|---|
| Cash at Bank | $ 1,132 |
| Cash at Broker –Futures | $ 6,273,473 |
| Open Trade Equity –Futures | $ 147,628 |
| Cash at Broker –Securities | $ (527,103) |
| Stock Positions Held: | |
| *Market Value of Stock Positions (Long)* | $ 9,523,287 |
| DFA Emerging Markets Small Cap, Prudent Global Inc. Funds, the Contrarian Value Fund, US Global Resources Fund, US Global China Region Opportunity, Hussman Invt Strategic Growth, Ishares S&P Global Telecommunications Sector Index, Morgan Stanley India Invst, RS Invt Global Natural Res, Aluminium Corp China, Almaden Minerals, A S V Inc, BHP Billiton, Bema Gold , Compania De Minas, Chesapeake Energy, Compania Siderurgica, Eldorado Gold, Foundry Networks, Frontline Ltd., Fording Canadian Coal, Freeport McMoran Copper & Gold, Graftech Int'l, Golden Star Resources, Ishares MSCI S. Africa Index, Ishares Dow Jones US Energy, Ishares Dow Jones US basic Materials, Ivanhoe Energy, Ishares S&P Latin Amer 40 Index, Ishares MSCI Pacific ex-Japan Index, Ishares MSCI Brazil Free Index, International Uranium, Ivanhoe Mines, Inco Ltd, JYSKE Bank, Jilin Chemical Industrial, KOS Pharmaceuticals, Nevsun Resources, North America Palladium, PetroChina Co, Pensgrowth Dev., Radyne Comstream, Randgold & Exploration Co, Rimfire Minerals, Rio Narcea Gold Mines, Sector Spdr, Streettracks Ser, Stewart Info Services, Suncor Energy, Tahera Corp, WMC Resources, Western Oil Sands, Wheaton River Minerals, Clayton Williams Energy, Call ASA Ltd | |
| *Market Value of Stock Positions (short)* | $ (947,487) |
| AC Moore Arts & Crafts, Family Dollar Stores, Mentor Graphics, Payless Shoesource, Priceline Com, Trimeris Inc, Wal-Mart Stores Inc | |
| Promissory Notes Receivable | $ 12,565,050 |
| Interest Receivable –Promissory Notes | $ 5,978,374 |
| **Total Investments** | **$ 33,014,354** |

Ex. #8

### Longboat Global Funds Management, LLC
2 N. Tamiami Trail, Suite 1200
Sarasota, FL 34236-5560
941-361-2184 voice
941-361-2186 fax

July 2, 2004

Dear Piranha Fund, LP Investors:

In an effort to keep you informed of the status of your investment in Piranha Fund, LP as well as ensure that you have some key information about the Fund and its investments, we are sending you this short letter as well as a more detailed Quarterly Report. We encourage you to thoroughly read the Quarterly Report because it sets forth a description of the context and background for some of the items in this letter and gives a status report on the investments.

In conversations and other dealings you may have had with Longboat or its consultant, Investment Research Associates, you may already know much of the information in this letter and the Quarterly Report. We are available to answer any questions that you may have.

As of June 2004, the real estate linked notes comprise just over half of the Fund's assets. In most cases, the Fund's consultant, Investment Research Associates, conducted the due diligence in connection with the real estate linked investments. Longboat did not independently conduct such due diligence. The makers (borrowers) of several of the notes are entities controlled by parties related to Longboat. Several of the related party notes are issued by companies controlled by me and I have personally guaranteed those notes.

With the exception of one of the related party notes, none of the notes have been repaid. The notes have been routinely renewed after their original stated maturity date. To the extent that the Fund has a security interest in the underlying assets of the issuers of the notes, with the exception of one property, the Fund has not perfected any of such security interests. To Longboat's knowledge, there are no lenders that have perfected security interests in connection with these properties. Longboat charges its management fees based on the net asset value of the Fund and its incentive fees based on the increase in such Net Asset Value from the prior period. Net Asset Value includes the outstanding principal value of the notes held by the Fund and the unpaid accrued interest on such notes as assets in such calculations.

Again, the enclosed Quarterly Report provides more background and facts related to the information in this letter and a status report on the real estate related investments.

Thank you for your continued interest in the Fund.

Very truly yours,

Joe Beasley
President
Longboat Global Funds Management, LLC

Ex. # 9

**BEFORE THE**
**NATIONAL FUTURES ASSOCIATION**

In the Matter of:                              )
                                               )
LONGBOAT GLOBAL FUNDS                          )
MANAGEMENT LLC                                 )
(NFA ID #309313),                              )        NFA Docket No. 04-MRA-002
                                               )
        and                                    )
                                               )
ROBERT JOSEPH BEASLEY                          )
(NFA ID #263242)                               )

**NOTICE OF MEMBER AND ASSOCIATE RESPONSIBILITY**
**ACTIONS UNDER NFA COMPLIANCE RULE 3-15**

        National Futures Association ("NFA") hereby gives notice to Longboat Global
Funds Management LLC ("Longboat"), a commodity pool operator ("CPO") and commodity
trading advisor Member of NFA and Robert Joseph Beasley ("Beasley"), a principal and
associated person ("AP") of Longboat, that pursuant to NFA Compliance Rule 3-15, the
President of NFA, with the concurrence of NFA's Executive Committee, has taken a Member
Responsibility Action ("MRA") against Longboat and an Associate Responsibility Action
("ARA") against Beasley, whereby:

        1.      Longboat and Beasley are prohibited from soliciting or accepting any funds

or other things of value from any prospective or existing customer or participant in any pool that Longboat and/or Beasley operate;

2.   Except for meeting demands for redemption made by existing pool participants, Longboat and Beasley are prohibited from disbursing any funds from any pool trading accounts and any other accounts holding pool funds, without prior approval from NFA;

3.   Longboat and Beasley are prohibited from making any loans of pool funds, or investing in any promissory notes or other debt instruments or in any real estate related investment, without prior approval from NFA.

4.   Longboat and Beasley are required to provide copies of this MRA and ARA via overnight courier to all pool participants in any pools which Longboat and/or Beasley operate or over which either of them exercises control, including but not limited to Piranha Capital L.P. and Piranha Capital Investment (Bahamas) Ltd.

These actions are effective immediately and are deemed necessary to protect the commodity futures markets, pool participants, customers and other NFA Members because Longboat has been unable to demonstrate to the satisfaction of NFA that it has accurately reflected the net asset value of Piranha Capital L.P. in that pool's books and records and the reports to its participants.

In support of these actions, NFA attaches the affidavit of Vilia Sutkus-Kiela, a Team Manager in NFA's Compliance Department, and based thereon alleges as follows:

1.   Longboat is a CPO Member of NFA which operates six hedge funds, two of which are listed as commodity pools with NFA, viz., Piranha Capital L.P. and Piranha Capital Investment (Bahamas) Ltd. NFA performed an audit of Longboat which focused on Piranha Capital L.P.

2.   As of December 31, 2003, Piranha Capital L.P. reported that it had sixty-five participants and that its net asset value was approximately $31.4 million comprised of $18.5 million in promissory notes, payable to Piranha Capital L.P., and approximately $14.5 million in liquid assets.

3.   Piranha Capital L.P.'s offering memorandum indicated that it would primarily invest in equities and futures and made no mention that it intended to make loans in exchange for promissory notes.  Nevertheless, over the past several years, Piranha Capital L.P. has made numerous loans to parties for which it has received promissory notes in exchange.

4.   For example, during 2001 and 2002, Piranha Capital L.P made approximately thirty-five loans, totaling approximately $12 million to seven different entities, which were purportedly used to finance real estate projects in the United States and Central America.  Nearly $4 million of these loans were made to entities in which Beasley had an ownership interest ("Beasley related loans").  These notes had maturities ranging from four months to one year and initial interest rates in varying amounts, ranging from 8% to 39%.

5.   When the original notes came due, at various times in 2002 and 2003, the notes'

obligors failed to make any payment on the notes of either principal or interest. Whereupon, Longboat and Beasley renegotiated the notes by extending the maturity dates and reducing the interest rates. When these renegotiated notes came due, the obligors again failed to make any payments on the notes and Longboat and Beasley renewed the notes for another year. To date, the notes' obligors have not made any payments to Piranha Capital L.P. of either principal or interest on any of the notes – except for a partial payment that Beasley made in August 2004 on one of the Beasley related loans, which occurred only after NFA commenced its review of Longboat, Beasley, and Piranha Capital L.P.'s activities.

6.      In Piranha Capital L.P.'s 2001, 2002, and 2003 certified financial statements, Longboat and Beasley represented to participants that the aforementioned notes are secured by real estate in the United States and Central America. However, Longboat and Beasley have admitted to NFA that they failed to perfect the security interests relative to these notes. Moreover, due to ambiguities in the notes' descriptions of the properties which supposedly secure the notes, it is questionable whether valid security interests were ever created in the first place, irrespective of whether or not they were perfected. As to this issue, NFA requested in August that Longboat and Beasley provide NFA with a formal opinion letter from a law firm addressing the validity of the notes' purported security interests. NFA is waiting to receive this opinion letter.

7.      NFA asked Longboat and Beasley for documentation of the due diligence they conducted prior to making the above loans. In response, their attorney represented that there was no formal due diligence process with respect to the issuers of the notes or the property identified in the notes as security. The documents Longboat and Beasley provided to NFA were property appraisals that were done after the loans were already made. Consequently, Longboat and Beasley have failed to demonstrate to NFA's satisfaction that the obligors on the notes are credit worthy, that they hold good title to the properties which purportedly secure the notes, or that those properties are unencumbered, and marketable, assuming valid security interests even exist.

8.      Moreover, the Chawla Group, the CPA firm which prepared the certified financial statements for Piranha Capital L.P., represented to NFA that in preparing the certified financial statements it merely confirmed the existence of the notes with the notes' counter-parties, and did not obtain any financial statements from the counter-parties, or perform any analyses on the viability of the real estate projects, which purportedly secured the notes, or review any appraisals for these projects.

9.      Until directed to do so by NFA in July 2004, Longboat and Beasley failed to disclose to all participants of Piranha Capital L.P. that a significant portion of the pool's assets had been used to make loans to real estate projects, two of which were owned in whole or in part by Beasley; that there had been no repayment of either principal or interest on any of the notes held by Piranha Capital L.P; that Longboat and Beasley had repeatedly renewed these notes, despite the failure of the notes' obligors to make any repayment of principal and interest; and that management and incentive fees were based in part on the face value of the unpaid notes and unpaid accrued interest.

10.      In early July 2004, NFA required Longboat and Beasley to disclose the above facts

to Piranha Capital L.P.'s participants. After these disclosures were made to participants, Longboat received approximately $3.3 million in redemption requests in July, $2.2 million in redemption requests in August, and $3.3 million in redemption requests thus far in September. Longboat has not provided NFA with documentation that definitively establishes that all of the July and August redemption requests have been paid. It has also acknowledged to NFA that the September redemption requests are due to be paid in October.

11.    Longboat's June 30, 2004 account statement for Piranha Capital L.P. reported that the net asset value of the pool was approximately $35.5 million, consisting of approximately $20 million in notes (including principal and unpaid interest) and $15.5 million in liquid assets. When the $35 million net asset value of the pool as reported in its June 30, 2004 account statement is reduced by the redemptions listed in paragraph 10 above, the current net asset value of Piranha Capital L.P. is approximately $26 million–comprised of approximately $20 million in notes and $6.6 million in liquid assets.

12.    On September 17, 2004, the attorney for Longboat and Beasley advised NFA that Piranha Capital L.P. intended to loan $2.5 million to finance another real estate project in exchange for a promissory note similar to the notes described above. Such an investment would further reduce Piranha Capital L.P.'s liquid assets to approximately $4 million which would significantly impair the pool's financial ability to honor redemption requests from the remaining pool participants.

The MRA and ARA will remain in effect until such time as Longboat and Beasley have demonstrated to the satisfaction of NFA that they are in full compliance with all NFA Requirements and that the net asset value of Piranha Capital L.P. is accurately reflected in the pool's books and records and reports to its participants.

NFA Members receiving notice of this MRA and ARA by service or otherwise who carry accounts in the name of, or controlled by, Longboat, Beasley, or either of them, are prohibited from disbursing funds to Longboat or Beasley or any entity controlled by them for any reason without prior approval of NFA.

Longboat and Beasley are entitled to a prompt hearing on this matter before NFA's Hearing Committee if they so request. The request for hearing shall be made in writing to: National Futures Association, 200 West Madison Street, Suite 1600, Chicago, Illinois 60606-3447, Attention: Legal Docketing Department.

Aggrieved parties may petition the Commission for a stay of this MRA and ARA pending a hearing pursuant to and in conformity with the terms set forth in Commission Regulation 171.41.

**NATIONAL FUTURES ASSOCIATION**

Date:  September 20, 2004

_____
Daniel J. Roth, President

/nam(MRA:Longboat Global Funds.pmr)

## AFFIDAVIT

THE AFFIANT, VILIA SUTKUS-KIELA, BEING DULY SWORN AND UNDER OATH STATES THAT:

1.      My name is Vilia Sutkus-Kiela, and I am employed by National Futures Association ("NFA") as a Team Manager in the Compliance Department. In my capacity as a Team Manager, I led a team that conducted an audit of Longboat Global Funds Management LLC ("Longboat").

2.      According to NFA's registration records, Longboat is an NFA Member registered with the Commodity Futures Trading Commission as a commodity pool operator and commodity trading advisor and Robert Joseph Beasley ("Beasley") is an NFA Associate and registered associated person of Longboat, as well as a listed principal of the firm. Longboat is located at 2 North Tamiami Trail, Suite 1200, Sarasota, FL 34236.

3.      Longboat operates six hedge funds, two of which are listed as commodity pools with NFA, viz., Piranha Capital L.P. and Piranha Capital Investment (Bahamas) Ltd. NFA performed an audit of Longboat which focused on Piranha Capital L.P.

4.      As of December 31, 2003, Piranha Capital L.P. reported that it had sixty-five participants and that its net asset value was approximately $31.4 million comprised of $18.5 million in promissory notes, payable to Piranha Capital L.P., and approximately $14.5 million in liquid assets.

5.      Piranha Capital L.P.'s offering memorandum indicated that it would primarily invest in equities and futures and made no mention that it intended to make loans in exchange for promissory notes. Nevertheless, over the past several years, Piranha Capital L.P. has made numerous loans to parties for which it has received promissory notes in exchange.

6.      For example, during 2001 and 2002, Piranha Capital L.P made approximately thirty-five loans, totaling approximately $12 million to seven different entities, which were purportedly used to finance real estate projects in the United States and Central America. Nearly $4 million of these loans were made to entities in which Beasley had an ownership interest ("Beasley related loans"). These notes had maturities ranging from four months to one year and initial interest rates in varying amounts, ranging from 8% to 39%.

7.      When the original notes came due, at various times in 2002 and 2003, the notes' obligors failed to make any payment on the notes of either principal or interest. Whereupon, Longboat and Beasley renegotiated the notes by extending the maturity dates and reducing the interest rates. When these renegotiated notes came due, the obligors again failed to make any payments on the notes and Longboat and Beasley renewed the notes for another year. To date, the notes' obligors have not made any payments to Piranha Capital L.P. of either principal or interest on any of the notes – except for a partial payment that Beasley made in August 2004 on one of the Beasley related loans, which occurred only after NFA commenced its review of Longboat, Beasley, and

Piranha Capital L.P.'s activities.

8.  In Piranha Capital L.P.'s 2001, 2002, and 2003 certified financial statements, Longboat and Beasley represented to participants that the aforementioned notes are secured by real estate in the United States and Central America. However, Longboat and Beasley have admitted to NFA that they failed to perfect the security interests relative to these notes. Moreover, due to ambiguities in the notes' descriptions of the properties which supposedly secure the notes, it is questionable whether valid security interests were ever created in the first place, irrespective of whether or not they were perfected. As to this issue, NFA requested in August that Longboat and Beasley provide NFA with a formal opinion letter from a law firm addressing the validity of the notes' purported security interests. NFA is waiting to receive this opinion letter.

9.  NFA asked Longboat and Beasley for documentation of the due diligence they conducted prior to making the above loans. In response, their attorney represented that there was no formal due diligence process with respect to the issuers of the notes or the property identified in the notes as security. The documents Longboat and Beasley provided to NFA were property appraisals that were done after the loans were already made. Consequently, Longboat and Beasley have failed to demonstrate to NFA's satisfaction that the obligors on the notes are credit worthy, that they hold good title to the properties which purportedly secure the notes, or that those properties are unencumbered, and marketable, assuming valid security interests even exist.

10. Moreover, the Chawla Group, the CPA firm which prepared the certified financial statements for Piranha Capital L.P., represented to NFA that in preparing the certified financial statements it merely confirmed the existence of the notes with the notes' counter-parties, and did not obtain any financial statements from the counter-parties, or perform any analyses on the viability of the real estate projects, which purportedly secured the notes, or review any appraisals for these projects.

11. Until directed to do so by NFA in July 2004, Longboat and Beasley failed to disclose to all participants of Piranha Capital L.P. that a significant portion of the pool's assets had been used to make loans to real estate projects, two of which were owned in whole or in part by Beasley; that there had been no repayment of either principal or interest on any of the notes held by Piranha Capital L.P; that Longboat and Beasley had repeatedly renewed these notes, despite the failure of the notes' obligors to make any repayment of principal and interest; and that management and incentive fees were based in part on the face value of the unpaid notes and unpaid accrued interest.

12. In early July 2004, NFA required Longboat and Beasley to disclose the above facts to Piranha Capital L.P.'s participants. After these disclosures were made to participants, Longboat received approximately $3.3 million in redemption requests in July, $2.2 million in redemption requests in August, and $3.3 million in redemption requests thus far in September. Longboat has not provided NFA with documentation that definitively establishes that all of the July and August redemption requests have been paid. It has also acknowledged to NFA that the September redemption requests are due to be paid in October.

13. Longboat's June 30, 2004 account statement for Piranha Capital L.P. reported that the net asset value of the pool was approximately $35.5 million, consisting of approximately $20 million in notes (including principal and unpaid interest) and $15.5 million in liquid assets. When the $35 million net asset value of the pool as reported in its June 30, 2004 account statement is reduced by the redemptions listed in paragraph 12 above, the current net asset value of Piranha Capital L.P. is approximately $26 million–comprised of approximately $20 million in notes and $6.6 million in liquid assets.

14. On September 17, 2004, the attorney for Longboat and Beasley advised NFA that Piranha Capital L.P. intended to loan $2.5 million to finance another real estate project in exchange for a promissory note similar to the notes described above. Such an investment would further reduce Piranha Capital L.P.'s liquid assets to approximately $4 million which would significantly impair the pool's financial ability to honor redemption requests from the remaining pool participants.

15. Further the Affiant sayeth naught.

_____
Vilia Sutkus-Kiela

Subscribed and sworn to before me
on this 20th day of September 2004

_____
Notary Public

m:\pmr.MRA.Longboat Beasley.Declaration of Vilia Sutkus-Kiela.doc

Philip M. Raleigh
Senior Attorney
National Futures Association
200 W. Madison Street
Suite 1600
Chicago, IL 60540
312-781-1405 [telephone]
312-781-1537 [fax]
praleigh@nfa.futures.org



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

**DOCKETED**

OCT 1 2 2004

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use <u>only</u> in the Northern District of Illinois.

**Plaintiff(s):** THEODORE F. GRADEL, SARAH GRADEL, THOMAS A. MAZZA, JAMES X. MAUDE

County of Residence: Cook, Illinois

Plaintiff's Atty:  Robert B. Christie
HENDERSON & LYMAN
175 West Jackson, Suite 240
312-986-6960

**Defendant(s):** PIRANHA CAPITAL, L.P., LONGBOAT GLOBAL FUNDS MANAGEMENT, LLC, LONGBOAT GLOBAL ADVISORS, L.L.C., and ROBERT JOSEPH BEASLEY

County of Residence: Sarasota, Florida

Defendant's Atty:

## 04C 6539

**II. Basis of Jurisdiction:**    **4. Diversity (complete item III)**

JUDGE AMY ST. EVE

MAGISTRATE JUDGE DENLOW

**III. Citizenship of Principal Parties**
**(Diversity Cases Only)**

Plaintiff:- **1 Citizen of This State**
Defendant:- **2 Citizen of Another State**

**IV. Origin :**    **1. Original Proceeding**

**V. Nature of Suit:**    **850 Securities / Commodities / Exchange**

**VI. Cause of Action:**    **Jurisdiction: 28 U.S.C. § 1332 Causes of Action: breach of contract by failing to redeem partnership interest upon valid demand; fraud and statutory causes of action based on ommission and false statements in financial statements, Securities Act of 1933, 15 U.S.C. § 78j, SEC Rule 10b-5, 17 C.F.R. 240.10b-5.**

**VII. Requested in Complaint**
Class Action: **No**
Dollar Demand: **1,033,334.80**
Jury Demand: **No**

**VIII.** This case **IS NOT** a refiling of a previously dismissed case.

FILED-ED4
2004 OCT -8 PM 4:12
CLERK
DISTRICT COURT

**Signature:**

**Date:** October 8, 2004

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the**

http://www.ilnd.uscourts.gov/PUBLIC/Forms/auto_js44.cfm            10/8/2004

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**

**OCT 1 2 2004**

In the Matter of

Theodore F. Gradel, Sara Gradel, Thomas A. Mazza, and James X. Maude   v.
Piranha Capital, L.P., Longboat Global Funds Management, LLC, Longboat Global Advisors, L.L.C., and Robert Joseph Beasley

Case Number: **04C 6539**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Theodore F. Gradel, Sara Gradel, Thomas A. Mazza, and James X. Maude (Plaintiffs)

JUDGE AMY ST. EVE

MAGISTRATE JUDGE DENLOW

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME   Robert B. Christie | NAME   Jeffry M. Henderson |
| FIRM   Henderson & Lyman | FIRM   Henderson & Lyman |
| STREET ADDRESS   175 West Jackson, Suite 240 | STREET ADDRESS   175 West Jackson, Suite 240 |
| CITY/STATE/ZIP   Chicago, Illinois 60604 | CITY/STATE/ZIP   Chicago, Illinois 60604 |
| TELEPHONE NUMBER   312-986-6957    FAX NUMBER   312-086-6961 | TELEPHONE NUMBER   312-986-6955    FAX NUMBER   312-986-6961 |
| E-MAIL ADDRESS   rchriste@henderson-lyman.com | E-MAIL ADDRESS   jhenderson@henderson-lyman.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)   ARDC 6229020 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)   ARDC 9479450 |
| MEMBER OF TRIAL BAR?   YES ☒   NO ☐ | MEMBER OF TRIAL BAR?   YES ☒   NO ☐ |
| TRIAL ATTORNEY?   YES ☒   NO ☐ | TRIAL ATTORNEY?   YES ☒   NO ☐ |
|  | DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☐ |
| (C) | (D) |
| SIGNATURE | SIGNATURE |
| NAME | NAME |
| FIRM | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER    FAX NUMBER | TELEPHONE NUMBER    FAX NUMBER |
| E-MAIL ADDRESS | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?   YES ☐   NO ☐ | MEMBER OF TRIAL BAR?   YES ☐   NO ☐ |
| TRIAL ATTORNEY?   YES ☐   NO ☐ | TRIAL ATTORNEY?   YES ☐   NO ☐ |
| DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☐ | DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☐ |

FILED-ED4
2004 OCT -8 PM 4:12
CLERK
U.S. DISTRICT COURT

1-3